UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HUNTER HARRIS and CORA CLUETT,

Plaintiffs,

v.

UNIVERSITY OF MASSACHUSETTS
LOWELL, JACQUELINE MOLONEY,
UNIVERSITY OF MASSACHUSETTS
BOSTON, MARCELO SUAREZ-OROZCO
and SHAWN DE VEAU,

Defendants.

C.A. No. 1:21-CV-11244

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION AND IN SUPPORT OF MOTION TO DISMISS**

MAURA HEALEY
ATTORNEY GENERAL

Richard S. Weitzel (BBO No. 630303)
  *Assistant Attorney General*
Christine Fimognari (BBO No. 703410)
  *Special Assistant Attorney General*
Office of the Attorney General of Massachusetts
Government Bureau
One Ashburton Place
Boston, MA 02108
617-963-2022
Richard.Weitzel@mass.gov

August 17, 2021

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................2

    I.     COVID-19 ..............................................................................................................2

    II.    The COVID-19 Pandemic ......................................................................................3

    III.   COVID Vaccines ....................................................................................................3

    IV.   Current COVID-19 Risks in Massachusetts ..........................................................6

    V.    The University Defendants .....................................................................................6

    VI.   The University's Vaccine Requirement ...................................................................7

    VII.  Plaintiffs ...............................................................................................................9

ARGUMENT ...........................................................................................................................9

    I.     Plaintiffs Have No Likelihood of Success on the Merits of Their Claims,
         Which Should Be Dismissed as a Matter of Law. ................................................ 10

         A.    The Complaint Should Be Dismissed as Against the UMass Boston
             and UMass Lowell Defendants Under the Eleventh Amendment. ........... 10

         B.    Vaccine Requirements Have Long Been Held to Be Constitutional. ....... 11

         C.    Plaintiffs Do Not Have a Viable Procedural Due Process Claim
             (Count I) ................................................................................................ 13

         D.    Plaintiffs Cannot Succeed on Their Substantive Due Process Claim
             (Count II) ............................................................................................... 15

             1.    Substantive Due Process - Analytical Framework ....................... 15

             2.    Substantive Due Process Claims Have Failed in the
                 Vaccination Context ................................................................... 16

             3.    Plaintiffs' Invocation of the "Right to Refuse Medical
                 Treatment" and "Right to Bodily Autonomy" Does Not
                 Translate into a Fundamental Right in this Case. ........................ 16

             4.    Rational Basis Review Applies in this Case. ............................... 18

             5.    The Vaccine Requirement Easily Satisfies Rational Basis
                 Review. ...................................................................................... 19

E.     The Vaccine Requirement Does Not Contravene Federal or State Law ....................................................................................... 22

    1.     Federal Law Presents No Impediment to the University's Actions. ................................................................................ 22

    2.     The Vaccine Requirement Does Not Violate State Law ............. 26

F.     Defendants' Denial of Plaintiff Cluett's Request for a Religious Exemption Did Not Violate Her Constitutional or Statutory Rights (Count III). ............................................................................... 28

    1.     Federal Claims .......................................................................... 29

         a.     Plaintiffs Have No Viable Clam that Defendants' Denial of Plaintiff Cluett's Request for a Religious Exemption Violates 42 U.S.C. § 2000bb-1 ...................... 29

         b.     Defendants' Denial of Plaintiff Cluett's Request for a Religious Exemption Did Not Violate Her First Amendment Free Exercise Rights. ................................... 29

              i. UMass Boston's Denial of Plaintiff Cluett's Request for a Religious Exemption Was Proper and Did Not Violate Her Right to the Free Exercise of Religion............................. 29

              ii. ....Even if the University Had Not Offered Any Religious Exemption, the Vaccine Requirement Would Not Have Violated Plaintiff Cluett's First Amendment Rights. ........... ................................................................................ 35

    2.     State Law Claims ....................................................................... 36

         a.     The Eleventh Amendment Bars Plaintiff Cluett's State Law Claims. ............................................................ 36

         b.     Defendants' Denial of Plaintiff Cluett's Request Does Not Violate M.G.L. c. 76, § 15 or 105 Code Mass. Regs. § 220.500. .................................................... 36

         c.     Defendants' Denial of Plaintiff Cluett's Request for a Religious Exemption Did Not Violate the Massachusetts Constitution................................................. 37

G.     Plaintiffs Have No Viable Claim Under 42 U.S.C. § 1983 (Count IV). ............................................................................................ 37

II.     The Other Preliminary Injunction Factors Strongly Favor Denial of Plaintiffs' Motion...................................................................................... 38

|  | A. | Plaintiffs Have Not Demonstrated Irreparable Harm | 38 |
|  | B. | The Balance of Hardships and the Public Interest Favor Denial of the Requested Injunction | 40 |
| CONCLUSION | | | 40 |

**INTRODUCTION**

Defendants University of Massachusetts Lowell ("UMass Lowell"), University of Massachusetts Boston ("UMass Boston") (collectively, the "University"), Jacqueline Moloney, Marcelo Suárez-Orozco and Shawn De Veau, respectfully submit this memorandum in opposition to Plaintiffs' Motion for Preliminary Injunction, and in support of their accompanying Motion to Dismiss.  Plaintiffs Hunter Harris and Cora Cluett, students at UMass Lowell and UMass Boston, respectively, seek to enjoin the University from enforcing the requirement that all students be fully vaccinated against COVID-19 prior to the beginning of the Fall 2021 semester in order to live, learn or otherwise conduct activities on campus ("Vaccine Requirement").  Plaintiffs assert that the Vaccine Requirement is unconstitutional and exceeds the Defendants' authority under federal and state law.

For the reasons described herein, Plaintiffs have no likelihood of succeeding on the merits of their claims and their case should be dismissed.  For over a century, the Supreme Court and federal courts around the country have uniformly held that vaccination mandates are constitutional, while summarily rejecting efforts by litigants to second-guess the public health judgments of state officials in this area.  The touchstone, then and now, is whether the requirement has a "rational basis" – a test that the Vaccine Requirement here easily passes. Indeed, just within the past two weeks, the Court of Appeals for the Seventh Circuit upheld a similar vaccine mandate imposed by Indiana University, stating that "[g]iven *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), which holds that a state may require all members of the public to be vaccinated against smallpox, there can't be a constitutional problem with [a university requiring] vaccination against SARS-CoV-2."  *Klaassen v. Trustees of Indiana University*, 2021 WL 3281209, *1 (7th Cir. August 2, 2021) ("*Klaassen II*").[1]  Ultimately, the leeway afforded to state and local actors in the area of vaccination is perhaps best encapsulated in one 2020 decision as such: "The court is unaware of *any case* in which a court has struck

---

[1]      Importantly, the *Klaassen* plaintiffs filed an application with Justice Barrett of the Supreme Court seeking to enjoin the Seventh Circuit's ruling, which she summarily denied on August 12, 2021, without even requesting a response from the university.  *See Klaassen v. Trustees of Indiana University*, Supreme Court Docket No. 21A15.

down a mandatory immunization imposed as a condition of attending school or college, as a condition of access to property for the purpose of employment, or as violating bodily autonomy." *Kiel v. Regents of the University of California*, 2020 WL 9396579, *9 (Cal. Super. Ct. Dec. 4, 2020) (emphasis added).

Presenting no affidavit evidence in support of their position, Plaintiffs nonetheless argue that there is something special about *this* vaccine and the impacts of *this* particular disease that should cause the Court to reach a different conclusion than the courts that have come before it. There is indeed something extraordinary about this situation, but not as the Plaintiffs would have it:  The Commonwealth and the University continue to grapple with the worst public health crisis in over a century, and the vaccines in question have been subjected to – and have passed – a real world test unlike any other, with over 357,000,000 doses being administered in the United States to date, with "major side effects [being] rare."  *Klaassen v. Trustees of Indiana Univ.*, 2021 WL 3073926, *37 (N.D. Ind. 2021) ("*Klaassen I*").  The severity and staying power of the current pandemic and the remarkable track record of the COVID vaccines counsel in favor of judicial deference to the University's decision-making here, not against it.  Plaintiffs' motion for preliminary injunction should therefore be denied and their Complaint should be dismissed for failure to state a claim upon which relief can be granted.

## BACKGROUND

### I.    COVID-19

COVID-19 is an infectious disease caused by SARS-Co-V-2, the novel coronavirus that primarily spreads through respiratory droplets and aerosol transmission.  Declaration of Sharone Green, M.D. ("Green Decl."), ¶ 10.[2]  People of all ages can contract and transmit COVID-19,

---

[2]  Defendants recognize that there are limitations on the Court's ability to consider certain facts in the context of Defendants' Motion to Dismiss.  The facts presented below, many of which are a matter of public record, are included to enable the Court to understand the relevant context for adoption of the Vaccine Requirement and to support Defendants' Opposition to the Motion for Preliminary Injunction. As discussed in the Argument section below, Plaintiffs' legal claims – on their face – are defective as a matter of law and are foreclosed by controlling precedent.  Consideration of much of the claims boils down to the question of whether there is a "rational basis" for the Vaccine Requirement.  In considering that question, the Court need only determine whether there is a plausible justification for the mandate, which "may be based on rational speculation unsupported by evidence or empirical data."  *F.C.C. v.*

2

and those who contract the disease may suffer severe illness or death, or incur long-term, ongoing health problems.  *Id*., ¶¶ 11-12.  Anyone who contracts COVID-19, including children and young people, can transmit the disease to others.  *Id*., ¶ 13.  And, while COVID-19 affects children and young adults less severely, it can still cause severe illness in these populations. *Id*.

## II.     The COVID-19 Pandemic

There have been approximately 35 million cases of COVID-19 in the United States and over 600,000 people have died from COVID-19 nationwide.  *Id*., ¶ 19.  The first confirmed case of COVID-19 in Massachusetts appeared on February 1, 2020 and, since that time, Massachusetts has had over 680,000 confirmed cases, approximately 17,770 confirmed deaths, and 370 "probable" deaths from the disease.  *Id*., ¶¶ 15-16.  Nationwide, persons between the ages of 18 and 29 have contracted the disease at a disproportionately high rate, accounting for 23% of all confirmed COVID-19 cases. *Id*., ¶ 17.  According to the New York Times, over 700,000 cases of COVID-19 have been linked to colleges and universities in the United States, including 260,000 cases in 2021.  *Id*., ¶ 20.  Over 600 colleges and universities in the United States are requiring students to be vaccinated against COVID-19 prior to the Fall 2021 semester, and that number continues to grow.  *Id*., ¶ 21.

## III.    COVID Vaccines

There are three COVID-19 vaccinations currently available in Massachusetts at no cost: the Pfizer BioNTech mRNA vaccine, the Moderna mRNA vaccine, and the Johnson/Janssen ("J&J") viral vector vaccine ("COVID Vaccines").  *Id*., ¶ 25.  The COVID Vaccines were developed and approved by the U.S. Food and Drug Administration ("FDA") under an Emergency Use Authorization ("EUA"), an approval method used during public health emergencies.  *Id*., ¶¶ 25-26.  The approval method for the COVID Vaccines has not jeopardized the rigorous and science-based standards for quality, safety and effectiveness of COVID-19

---

*Beach Communications, Inc*., 508 U.S. 307, 315 (1993).  Certainly, the Court can consider matters of public record, current events, and common sense in making this determination.  *See Koelsch v. Town of Amesbury*, 851 F. Supp. 497, 499 (D. Mass. 1994) (documents in public record can be considered for purposes of Rule 12(b)(6) motion).  In addition, as discussed in Section I.F.1.b.ii, *infra*, even Plaintiff Cluett's more fact-specific freedom of religion claim fails as a matter of law because she does not have a constitutional right to be granted an exemption from a vaccination requirement on religious grounds.

vaccines.  *Id*., ¶ 26.  "Because of the widespread use of a COVID-19 vaccine, the FDA informed manufacturers that it expected the same level of endpoint efficiency data as required for full approval, enough safety data to justify by clear and compelling evidence the vaccine's safety, and confirmation of the technical procedures and verification steps necessary to support full approval."  *Klaassen v. Trustees of Indiana University*, 2021 WL 3073926, *8 (N.D. Ind. 2021) ("*Klaassen I*").[3]  All three COVID Vaccines underwent study in multi-center, international, randomized controlled Phase 1, 2 and 3 clinical trials (Greene Decl., ¶ 27) -- "a rigorous development process that include[d] tens of thousands of study participants to generate the needed non-clinical, clinical, and manufacturing data."[4]  The COVID Vaccines demonstrated a high level of efficacy in the Phase 3 trials (Pfizer 95%, Moderna 94.1%, J&J 72%).  *Id*., ¶ 28.

The Centers for Disease Control and Prevention ("CDC") considers COVID-19 vaccination to be the best strategy for ending the COVID-19 pandemic by limiting the spread of the SARS-CoV-2 virus.  *Id*., ¶ 22.  It specifically considers vaccination of students and employees on college and university campuses to be the optimal approach for individual and campus-wide protection.  *Id*., ¶ 23.  Each of the COVID Vaccines has been shown to be safe and effective, with over 357 million doses having been administered in the United States between December 14, 2020 and August 9, 2021.  *Id*., ¶ 29.  Those who are vaccinated are less likely to be infected and to transmit the virus to others (including the so-called Delta variant of the virus) and, even with older people, their chances of hospitalization or death substantially decrease.  *Id*., ¶ 30.[5]  Indeed, recent data indicates that 99.99% of vaccinated individuals in Massachusetts and nationwide have not had a "breakthrough" case of COVID-19 that has resulted in hospitalization

---

[3]      *See also* "Emergency Use Authorization for Vaccines to Prevent COVID-19:  Guidance for Industry" at https://www.fda.gov/media/142749/download

[4]      *See* https://www.fda.gov/vaccines-blood-biologics/vaccines/emergency-use-authorization-vaccines-explained

[5]      Notably, while a recent COVID-19 outbreak in Provincetown, Massachusetts led to a high number of "breakthrough" cases involving the Delta variant, there were only a handful of hospitalizations and zero deaths among these individuals.  Green Decl., ¶ 49.  Moreover, overall efficacy of the COVID Vaccines during the Provincetown outbreak could not be assessed because the vaccination status of all individuals in Provincetown is unknown.  *Id*., ¶ 51.

or death.[6]   The CDC recommends that individuals who have already been infected with COVID-19 still receive a COVID Vaccine because the risk of re-infection after receiving a COVID Vaccine is markedly reduced.  Green Decl., ¶¶ 43-44.

The safety record of the COVID-19 Vaccines is remarkably strong.  There is no evidence of genotoxicity (pertaining to DNA or chomosomal damage), mutagenicity (permanent change in genetic structure of cells or organisms), teratogenicity (disturbance to development of embryo or fetus) or oncogenicity (production of tumors).  *Id*., ¶ 35.  The COVID Vaccines do not enter the nucleus or become part of a person's DNA.  *Id*., ¶ 36.  Rather, the vaccines activate an immune response to the "spike" protein of the virus that causes COVID-19.  *Id*.  While the immune response to this protein has been found to possibly be associated with some rare adverse events such as myocarditis and blood clots, the risks of these side effects is extremely low compared to the risks of severe complications from natural COVID-19 infection.  *Id*., ¶¶ 37-40.  Specifically, the rate of myocarditis in recipients of the COVID Vaccines has been found to be 13 cases per million (0.0013%) doses of the vaccines (with all cases being treated and survived), whereas, in contrast, 2.3% of COVID-19-recovered college athletes had imaging evidence of myocarditis.  *Id*., ¶ 39.  There have also been extremely rare reports of serious blood clots associated with low platelet counts following delivery of the J&J vaccine (0.2-2.3 cases per million doses), but the specific risk for this condition in those who actually contract COVID-19 is considerably higher, at 207 per million cases.  *Id*., ¶ 40.

Plaintiffs make reference to the Vaccine Adverse Event Reporting System ("VAERS"), erroneously claiming that it shows that the COVID Vaccines have "resulted in" a certain number of deaths. Complaint, ¶ 54.  VAERS is a passive reporting system for any vaccine administered in the United States.  Green Dec., ¶ 41.  It allows anyone, including a patient or family member of a patient, to report what they believe to be a symptom of a vaccine.  *Id*.  A symptom report to VAERS *does not imply or prove causation*, but rather only that a symptom or outcome occurred

---

[6]      *See* https://www.cnn.com/2021/07/31/health/fully-vaccinated-people-breakthrough-hospitalization-death/index.html, https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html (nationwide data) and https://www.mass.gov/doc/daily-covid-19-vaccine-report-august-10-2021/download (MA data).

at some point after vaccination, according to the reporting party.  *Id.*  The CDC monitors
VAERS reporting related to COVID-19, and has concluded that the benefits of the COVID
Vaccines outweigh their risks.  *Id.*, ¶ 42.

## IV.    Current COVID-19 Risks in Massachusetts

Since June 2021, there has been a steady increase in the number of cases of and
hospitalizations due to COVID-19 in Massachusetts.  *Id.*, ¶ 46.  COVID-19 transmission rates in
all Massachusetts counties are currently considered to be "substantial" or "high".  *Id.*, ¶ 56.  New
variants of COVID-19 continue to evolve and disseminate throughout the world, potentially
leading to viruses that are more contagious, easier to escape detection, and more virulent.  *Id.*, ¶
47.  The Delta variant, in particular, is known to be highly transmissible.  *Id.*, ¶ 50.   It is clear
that Massachusetts has not yet reached so-called "herd" immunity with respect to COVID-19.
*Id.*, ¶ 57.

While the mortality rate from COVID-19 among college-aged individuals (ages 18-29) is
lower than that in older groups, this age group has had the highest rates of infection since July
2020.  *Id.*, ¶ 65.  The rising numbers of infections in this age group has led to increasing number
of hospitalizations of young people, especially in the areas of the United States with low vaccine
rates.  *Id.*  Even where college students do not have severe symptoms from COVID-19, two
substantial risks remain:  (1) they may spread the disease to faculty and staff at their institutions,
as well as to the surrounding communities -- indeed, one modeling study shows the risk of
"super-spreader" events in neighboring communities during the first two weeks after students
return; and (2) the students may have long-term adverse health effects from COVID-19,
including concentration/memory difficulties, shortness of breath, fatigue, and even heart
inflammation.  *Id.*, ¶¶ 66-69.  In a matter of days, young people from all over the United States,
including those locales with low vaccination rates, will be coming to Massachusetts to attend not
just the University, but the scores of universities and colleges in the Commonwealth.

## V.    The University Defendants

The University of Massachusetts is a public research university created under M.G.L. c.
75, with four undergraduate and graduate campuses, including UMass Lowell and UMass

Boston.  Defendant Jacqueline Moloney is the Chancellor of UMass Lowell.  Defendant Marcelo Suárez-Orozco is the Chancellor of UMass Boston and Defendant Shawn De Veau is the Interim Vice Chancellor of Student Affairs at that campus.

## VI.  The University's Vaccine Requirement

More than 75,000 undergraduate and graduate students attend UMass.  Packard Decl. ¶ 2. As of Fall 2020, UMass Lowell had about 18,394 total students, and UMass Boston had about 16,259 total students enrolled.  *Id.*  Both the Lowell and Boston campuses have residential students who are often in congregate settings where the risk of spreading COVID-19 is great — students live in dorms on campus (with shared bathrooms, kitchens, and common areas), eat in communal dining halls, and share exercise facilities, classrooms, laboratories, performance spaces, locker rooms, social activity areas, and the like.  *Id.* ¶ 17.  For the Fall of 2021, UMass Boston anticipates that there will be roughly 1,077 students living on campus, and UMass Lowell anticipates that there will be roughly 3,877 students living on campus.  *Id.* ¶ 26.  UMass Boston and UMass Lowell have approximately 1,863 and 1,782 employees working on each campus, respectively.  *Id.* ¶ 29

In late April 2021, all UMass campuses, including UMass Boston and UMass Lowell announced that vaccinations would be required for all undergraduate and graduate students who wished to live, learn, or conduct research on campus by coming to campus or physically accessing campus resources for the Fall 2021 semester.  *Id.* ¶¶ 19, 21–22.  The decision to require vaccines was based upon CDC guidance that the COVID Vaccines are safe and present the most effective way of preventing the spread of COVID-19.  *Id.* ¶ 19.  The University's Vaccine Requirement permits students to apply for medical and religious exemptions, and the University has provided instructions on how to apply for such exemptions.  *Id.* ¶¶ 21–22.[7]

Requests for religious exemptions at UMass Boston are reviewed by a committee organized by the Director of University Health Services.  De Veau Decl. ¶¶ 5–6.  Students whose requests are denied by the committee have the opportunity to appeal the decision and provide

---

[7]     *See also* https://www.uml.edu/alert/coronavirus/returning/covid-vaccine-faq.aspx and https://www.umb.edu/healthservices/screening_clinics/immunizations

additional documentation in support of their request.  *Id.* Exs. E, F.  Shawn De Veau, the Interim

Vice Chancellor for Student Affairs, reviews the appeals.  *Id.* ¶ 3.

Students who fail to comply with the University's Vaccine requirement have the option

of taking online courses where available or deferring enrollment for the semester.  *Id.* ¶ 18, Ex.

F.  There are no academic or disciplinary sanctions (like expulsion) for failing to comply with

the Vaccine Requirement.  *Id.* ¶ 18.  Instead, students who fail to comply with the Vaccine

Requirement and opt not to take online courses are deemed not to meet the conditions for

enrollment at the University for the semester and cannot take in-person classes.  *Id.*  The student

is free to re-enroll at the University for a later semester, if the vaccination condition for

enrollment is met.  Essentially, a student who fails to comply with the Vaccine Requirement is in

the same position as a student who fails to pay tuition for the semester, and enrollment as a

student is deferred until the requisite condition for enrollment is satisfied.

At the time when the student vaccination requirements were announced in late April

2021, the University of Massachusetts strongly recommended that faculty and staff be vaccinated

prior to the fall semester and it began the work needed to reach agreement concerning a vaccine

requirement with the unions representing bargaining units comprising the majority of the

University's employees.  Packard Decl. ¶ 20–24.  On August 11, 2021, UMass Lowell

announced that all non-union and part-time employees would be required to be vaccinated

(subject to religious and medical exemptions), and that the campus was in discussion with each

of its unions to reach agreement on requiring vaccines for unionized faculty and staff.  *Id.* ¶ 34.

UMass Boston is currently in discussions with labor unions on such an agreement.  *Id.* ¶ 35.

UMass Lowell and Boston will require face coverings for all faculty in indoor common spaces

and take other preventative measures consistent with state and federal public health guidance.

*Id.* ¶ 34.  Elsewhere in the University, UMass Amherst has reached an agreement with campus

labor unions so that all faculty and staff are required to be vaccinated, and the UMass President's

Office and UMass Medical School also require vaccines for their employees, including their

union employees.  *Id.* ¶¶ 30, 31, 33.  In addition, the University has been working with all of its

vendors and suppliers so that the third parties who provide services to the University's campuses

are likewise required to be vaccinated and are bound to observe the other safety measures in place on each campus.  *Id*. ¶¶ 33–34.

## VII.  Plaintiffs

Plaintiff Hunter Harris is a resident of Medway, Massachusetts and an incoming Junior enrolled at UMass Lowell.  Complaint, ¶¶ 1, 41.  Harris alleges that he had not taken the COVID vaccine and does not qualify for either a medical or religious exemption to the Vaccine Requirement.  *Id*., ¶¶ 42-43.

Plaintiff Cluett is a resident of Quincy, Massachusetts and an incoming Senior at UMass Boston.  Complaint, ¶ 2.  She first enrolled at UMass Boston as a student in fall 2018 (submitting, as she was required to do, proof that she had all required vaccinations), and has been enrolled each semester since then except for Fall 2020, when she chose not to enroll in classes. De Veau Decl. ¶ 12.  Cluett is a member of the women's track team and participates in other student activities.  *Id.;* Complaint, ¶ 45.  Cluett submitted a request for a religious exemption in May 2021, which was denied, after both an initial review and an appeal to Vice Chancellor De Veau.  De Veau Decl. ¶¶ 10, 13, 17.  A more detailed discussion of the nature of Cluett's request for a religious exemption, and the University's denial of such request is provided below at pages 29-35 and in the accompanying affidavit of Mr. De Veau.

## ARGUMENT

A preliminary injunction is "a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), "never awarded as of right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "To obtain a preliminary injunction, the plaintiffs bear the burden of demonstrating (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003).  The last two factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The first factor—likelihood of success on the merits—is the "*sine qua non* of a preliminary injunction.  If the moving party cannot demonstrate that he is likely to succeed in his quest, the

remaining factors become matters of idle curiosity." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 173 (1st Cir. 2015).  "[T]he movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

To avoid dismissal under Fed. R. Civ. P. 12(b)(6), a complaint must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)*.* The Court need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Dismissal is appropriate if the well-pleaded facts do not "possess enough heft" to show an entitlement to relief. *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008).

I.    **Plaintiffs Have No Likelihood of Success on the Merits of Their Claims, Which Should Be Dismissed as a Matter of Law.**

A.    **The Complaint Should Be Dismissed as Against the UMass Boston and UMass Lowell Defendants Under the Eleventh Amendment.**

As an initial matter, the claims against UMass Boston and UMass Lowell should be dismissed in their entirety because they are barred by the Eleventh Amendment.  "The Supreme Court has clearly said that the Eleventh Amendment bars federal suits by citizens against the state or state agencies and this 'jurisdictional bar applies regardless of the nature of the relief sought.'" *O'Neill v. Baker*, 210 F.3d 41, 47 (1st Cir. 2000) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)).  "The University of Massachusetts 'is a public institution established under the laws of the Commonwealth of Massachusetts and is therefore an arm of the state.'" *Harnois v. Univ. of Mass. at Dartmouth*, 2019 WL 4762604, *2 (D. Mass. 2019) (dismissing claims under Eleventh Amendment).  *See also U.S. ex rel. Willette v. University of Massachusetts Worcester*, 812 F.3d 35, 40 (1st Cir. 2016) ("[T]he statutory framework crafted by the Massachusetts legislature lends itself to the conclusion that the University of Massachusetts . . . is an arm of the state.")  The claims against UMass Boston and UMass Lowell, accordingly, cannot go forward.

**B.      Vaccine Requirements Have Long Been Held to Be Constitutional.**

On the merits, while Defendants will address each of Plaintiffs' claim in turn, they should

first be viewed in the context of a broader truth:  In the United States, state compulsory

vaccination measures have been deemed fundamentally *constitutional*.  Indeed, "[f]or more than

100 years, the United States Supreme Court has upheld the right of the States to enact and

enforce laws requiring citizens to be vaccinated."  *Whitlow v. California*, 203 F.Supp.3d 1079,

1083 (S.D. Cal. 2016).  As early as 1905, in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the

Court rejected a constitutional challenge to a mandatory smallpox vaccination broadly imposed

by the City of Cambridge upon its citizens, holding that such a measure represented a valid

exercise of the State's police powers and did not "invade[] any right secured by the Federal

Constitution."  *Id*. at 38.  The *Jacobson* Court made clear that "a community has the right to

protect itself against an epidemic of disease which threatens the safety of its members" and "it

was the duty of the constituted authorities to keep in view the welfare, comfort and safety of the

many, and not permit the interests of the many to be subordinated to the wishes or convenience

of the few."  *Id*. at 27, 29.  Notably, the Court in *Jacobson* envisioned a very limited role for

courts to play in reviewing vaccination measures:  only when the measure has "no real or

substantial relation" to the "public health, the public morals, or the public safety," or when the

law is "beyond all question, a plain, palpable invasion of the rights secured by fundamental law"

should it be disturbed.  *Id*. at 31.[8]

---

[8]        Contrary to Plaintiffs' suggestions, Pls. Memo at 16, the Supreme Court's recent order granting
an injunction pending appeal in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per
curiam) does not alter the vitality of *Jacobson,* especially as applied to compulsory vaccination measures.
The *Roman Catholic Diocese* case involved "very severe restrictions on attendance at religious services"
where the Court found that houses of worship were "single[d] out" for "especially harsh treatment" when
compared to non-religious organizations in the area.  *Id*. at 65-66.  The Court concluded that plaintiffs
were likely to show that the regulations did not satisfy the "strict scrutiny" applied to non-"neutral"
restrictions on religious activity.  The *Roman Catholic Diocese* case has nothing to do with compulsory
vaccination, however, and, indeed, Justice Gorsuch in his concurring opinion noted that *Jacobson*
involved "an entirely different mode of analysis" (*i.e*., "rational basis review") and "an entirely different
kind of restriction" (*i.e*., a vaccination measure).  *Id*. at 70 (Gorsuch, J., concurring).

The *Jacobson* court upheld a "mandatory" vaccine in the truest sense – the City of Cambridge required all members of the public to be vaccinated against smallpox (except for children with documented medical exemptions).  *Id*. at 12.  In the years that followed, the Court has approved state policies requiring vaccination as a condition of receiving a public benefit; namely, attending school.  *See Zucht v. King*, 260 U.S. 174, 176 (1922) (rejecting due process and equal protection challenges to school vaccination requirement, stating that it is "settled that it is within the police power of a state to provide for compulsory vaccination."); *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944).  More recently, federal courts have repeatedly and uniformly sustained vaccination requirements imposed as a condition of school attendance.[9]

And earlier this month, the Court of Appeals for the Seventh Circuit specifically affirmed the right of an institute of *higher education* (*i.e*., Indiana University) to require that students receive the COVID-19 vaccine before returning to school for the Fall 2021 semester – a ruling that Justice Barrett of the Supreme Court subsequently declined to disturb.  *Klaassen II*, 2021 WL 3281209, at *1-2; *see also* note 1, *supra*.  In so ruling, the Court emphasized that such a restriction presents an "easier" case than *Jacobson,* as it involves the wholly voluntary choice of whether to attend a particular university.  *Id*. at *1.  The Court explained:

> Indiana does not require every adult member of the public to be vaccinated, as Massachusetts did in *Jacobson*.  Vaccination is instead a condition of attending Indiana University.  People who do not want to be vaccinated may go elsewhere.  Many universities require vaccination against [COVID-19], but many others do not.  Plaintiffs have ample educational opportunities.

---

[9]     *See Phillips v. City of New York*, 775 F.3d 538, 542-45 (2d Cir. 2015) (upholding New York State's student vaccination requirements); *Workman v. Mingo County Bd. of Educ*, 419 F. App'x 348, 352-56 (4th Cir. 2011) (upholding West Virginia student vaccination law); *W.B. v. Crossroads Academy-Central*, 2019 WL 6257963 at *1 (W.D. Mo. 2019) (upholding Missouri student vaccination law); *V.D. v. State of New York*, 403 F.Supp.3d 76, 86-88 (E.D.N.Y. 2019) (states are afforded "ample discretion . . . to protect the public health and welfare of their constituents, including by enacting mandatory vaccination laws"; collecting cases); *Whitlow*, 203 F.Supp.3d at 1083-85 (upholding California law that removed religious exemption to school vaccination requirement, citing federal and state cases).

*Id.* As such, "*there can't be a constitutional problem with vaccination against [COVID-19].*"
*Id.* (emphasis added).[10]

### C.        Plaintiffs Do Not Have a Viable Procedural Due Process Claim (Count I)

With respect to the specific counts in the Complaint, Plaintiffs first make a perfunctory
argument that the Vaccine Requirement violates their procedural due process rights, claiming
that they "hold a liberty interest in continuing their education at both UMass Schools"; that
"[t]here is nowhere for the plaintiffs to go with respect to public schooling in Massachusetts";
and that the University apparently did not provide them with the procedural protections that they
were "due" in enforcing its vaccine policies. Pls. Memo at 14. This claim is a non-starter,
however, because the Vaccine Requirement is a prospective rule of general application, and thus
it is not subject to the notice and hearing requirements of the Due Process Clause.

For purposes of procedural due process claims, the Supreme Court has long drawn a
distinction between "proceedings for the purpose of promulgating policy-type rules or standards,
on the one hand, and proceedings designed to adjudicate disputed facts in particular cases, on the
other." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). "Where a rule of
conduct applies to more than a few people, it is impracticable that everyone should have a direct
voice in its adoption." *Bi-Metallic Investment Co. v. State Board of Equalization* 239 U.S. 441,
445 (1915). Thus, "[g]overnmental determinations of a general nature that affect all equally do
not give rise to a due process right to be heard." *Neinast v. Bd. of Trustees of Columbus Metro.
Library*, 346 F.3d 585, 596-97 (6th Cir. 2003). Ultimately, the question whether due process
rights attach turns on whether government conduct affecting an allegedly protected interest "is
legislative or adjudicative in nature." *Garcia-Rubiera v. Fortuno*, 665 F.3d 261, 272 (1st Cir.
2011). Government action is legislative in nature when it "has general application and look[s] to

---

[10]        As the Court in *Klaassen* implicitly recognized, there is no requirement that a vaccine
requirement come directly from the state legislature in order for it to be upheld. In *Jacobson*, the court
confirmed that "local government agenc[ies]" may impose vaccine mandates under the state's police
powers (in that case, the City of Cambridge). 197 U.S. at 25. Other courts have upheld the right of a
state university or state hospital to enforce vaccine requirements. See *Klaassen, supra* (state university);
*Kiel*, 2020 WL 9396579 (state university); *George v. Kankakee Community College*, 2014 WL 6434152,
*3 (C.D. Ill. 2014) (state hospital).

the future." *Interport Pilots Agency Inc. v. Sammis*, 14 F.3d 133, 143 (2d Cir. 1994) (internal quotation marks omitted).  On the other hand, government action is adjudicative in nature when it is "designed to adjudicate disputed facts in particular cases." *Fla. E. Coast Ry.*, 410 U.S. at 245; *accord Interport Pilots*, 14 F.3d at 143.[11]

Here, the Vaccine Requirement is unquestionably "legislative" in nature.  It constitutes a rule of general application, applying broadly to all students attending the UMass Lowell and Boston campuses.  It operates prospectively, requiring students to receive the vaccine before the Fall semester begins in September 2021. While the Vaccine Requirement references the availability of medical and religious exemptions, it does not purport to decide or "adjudicate" application of these exemptions in any particular case; nor does it make any statements at all about particular individuals.  As such, like other COVID-19 rules of general applicability, it does not implicate procedural due process rights.[12]  *See Hartman v. Acton*, 2020 WL 1932896, *8 (S.D. Ohio 2020) (rejecting procedural due process challenge to COVID-19 business closure order); *Best Supplement Guide, LLC*, 2020 WL 2615022, *5 (E.D. Cal. 2020) (rejecting procedural due process challenge, as state defendants were under no "obligation to conduct individualized public health investigations before enacting any measures designed to protect the

---

[11]     Like statutes, governmental orders, rules, and regulations may be — and often are — legislative in nature because they adopt general rules that are not aimed at particular cases or parties. *See, e.g.*, *Gallo v. U.S. Dist. Ct. for the Dist. of Arizona*, 349 F.3d 1168, 1182-83 (9th Cir. 2003) (court rules that changed attorney licensing standards are legislative in nature); *Interport Pilots*, 14 F.3d at 142-44 (policy statement by a state board is legislative in nature); *RR Vill. Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1204-05 (2d Cir. 1987) (citing *Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271, 284 (1984), for the proposition that a "policy decision by [an] executive agency would be legislative action").

[12] Notably, Plaintiff Cluett -- for good reason -- does not attempt to argue that her procedural due process rights were violated in connection with UMass Boston's denial of her request for a religious exemption. *See* Pls. Memo, pp. 14-15; Complaint, ¶¶ 39-47.  As outlined in Plaintiffs' own complaint, ¶¶ 68-75, UMass Boston implemented a formal, multi-step review process in considering Cluett's request, which included an appeal to Vice Chancellor De Veau.  Cluett received notice that the University was considering her request, and was afforded ample opportunity to be heard on the matter.  *See* Declaration of Shawn De Veau, ¶¶ 4-17; discussion, *infra*, pp. 29-35.  Accordingly, she would have no conceivable basis for claiming a procedural due process violation.  *See Goss v. Lopez*, 419 U.S. 565, 579 (1975) (due process requires "some kind of notice [and] some kind of hearing.").

public from COVID-19's spread."); *Chrysafis v. Marks,* 2021 WL 2405802, *7 (E.D.N.Y. 2021) (COVID-19 eviction moratorium law did not present procedural due process concerns).[13]

### D.     Plaintiffs Cannot Succeed on Their Substantive Due Process Claim (Count II)

Plaintiffs' substantive due process claim is likewise deficient.  As explained below, courts have ruled that substantive due process challenges to state vaccination requirements are essentially foreclosed by Supreme Court precedent, namely *Jacobson* and *Zucht*, *supra*.  While the Supreme Court's holdings would indeed seem to entirely foreclose Plaintiffs' substantive due process claim here, Defendants will nonetheless proceed to discuss the conventional legal framework around such a claim, as applied to the Vaccine Requirement.  Ultimately, because the Vaccine Requirement does not infringe upon Plaintiffs' fundamental rights, it is merely subject to "rational basis" scrutiny, which it easily satisfies.

### 1.     Substantive Due Process - Analytical Framework

The doctrine of "substantive due process prevents governmental power from being used for purposes of oppression, or abuse of government power that shocks the conscience, or an action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests." *PZF Props, Inc. v. Rodriguez*, 928 F.2d 28, 31-32 (1st Cir. 1991) (internal quotations omitted). *See also Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) ("the substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'") (internal citations omitted).  Importantly, "[s]ubstantive due process protects only those interests that implicate one of 'those fundamental rights and liberties which are, objectively, deeply rooted in the Nation's history and tradition and implicit in the concept of ordered liberty, such as neither liberty nor justice would exist if they were sacrificed.'"  *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 880 n.

---

[13]     Courts addressing procedural due process challenges to COVID-19-related laws and orders have also sometimes rejected such claims on the additional basis that "summary administrative action may be justified in emergency situations." *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc* 452 U.S. 264, 300 (1981).  *See, e.g., World Gym, Inc. v. Baker*, 474 F. Supp. 3d 426, 433 (D. Mass. 2020) (Casper, J.) (discussing COVID-19 cases); *Hernandez v. Grisham*, 494 F. Supp. 3d 1044, 1145 (D.N.M. 2020).  The logic of these cases would apply with equal force here, as Defendants are undeniably addressing exigent and fluid public health threats caused by the ongoing COVID-19 pandemic.

13 (1st Cir. 2010) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)).  And "[w]here a fundamental right is not implicated, the state law need only be rationally related to a legitimate government interest."  *Workman*, 419 F. App'x at 355 (citing *Glucksberg*, 521 U.S at 728).  *See also Medeiros v. Vincent*, 431 F.3d 25, 32 (1st Cir. 2005) (where no fundamental right implicated, substantive due process is "governed by the 'rational basis' standard of review.")

### 2.    Substantive Due Process Claims Have Failed in the Vaccination Context.

In the mandatory vaccine context, courts have uniformly rejected substantive due process challenges, based largely on the Supreme Court precedent discussed *supra*, pp. 11-12.  *See Phillips*, 775 F.3d at 542 (plaintiffs' "substantive due process . . . argument is foreclosed by the Supreme Court's decision in [*Jacobson*]."); *Whitlow*, 203 F.Supp.3d at 1089 (substantive due process argument is "foreclosed by [*Zucht*]" (which was a due process case); "[u]nquestionably, imposing a mandatory vaccine requirement on school children as a condition of enrollment does not violate substantive due process.").  Underlying these decisions is a recognition that student vaccination requirements do not implicate fundamental rights, as the Court of Appeals for the Seventh Circuit recently concluded in the very same context that is presented here:

> Plaintiffs . . . substantive due process . . . argument depends on the existence of a fundamental right ingrained in the American legal tradition.  Yet *Jacobson*, which sustained a criminal conviction for refusing to be vaccinated, shows that plaintiffs lack such a right.  To the contrary, vaccination requirements, like other public-health measures, have been common in this nation.

*Klaassen II*, 2021 WL 3281209, at *1.  *See also Workman*, 419 F. App'x at 355 (school vaccination requirement did not implicate a fundamental right); *Boone v. Boozman*, 217 F.Supp.2d 938, 956-57 (E.D. Ark. 2002) (same).

### 3.    Plaintiffs' Invocation of the "Right to Refuse Medical Treatment" and "Right to Bodily Autonomy" Does Not Translate into a Fundamental Right in this Case.

In the face of this precedent, Plaintiffs nonetheless attempt to hitch their claims to a fundamental right by claiming that the Vaccine Requirement interferes with their "right to bodily autonomy" and their "right to refuse medical treatment."  Pls. Memo at 15.  They rely on *Cruzan*

*v. Director, Missouri Dept. of Health*, 497 U.S. 261, 279 (1990), where the Supreme Court held that a "competent person has a liberty interest under the Due process in refusing unwanted medical treatment" – in that case, unwanted lifesaving hydration and nutrition. *Id*. at 278-79. But mere invocation of these concepts does not answer the question of whether a fundamental right has been implicated. "Case precedent makes clear that not every decision relating to the body or bodily integrity is sufficiently intimate and personal to merit enhanced protection. For example, the Supreme Court has not recognized that the decision to reject vaccination implicates a 'fundamental interest,' although bodily invasion and medical treatment are unavoidably involved." *N.Y. State Ophthalmological Soc. v. Bowen*, 854 F.2d 1379, 1391 (D.C. Cir. 1988) (citing *Jacobson*). *See also Martinez v. Cui*, 608 F.3d 54, 66 n.12 (1st Cir. 2010) ("The government regularly regulates in ways that affect a person's body to protect the public interest," citing *Jacobson*).

Ultimately, in order for an asserted liberty interest to be truly "fundamental" it must be "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 721. But freedom from vaccination, quite obviously, has never attained this status. "To the contrary, vaccination measures, like other public-health measures, have been common in this nation." *Klaassen II*, 2021 WL 3281209, at *1 (rejecting Plaintiffs' "bodily integrity" argument). *See also Boone*, 217 F. Supp. 2d at 956 (plaintiff's "right to refuse medical treatment" does not extend to vaccinations because "[t]he Nation's history, legal traditions, and practices" make clear that "immunization [can be] a precondition to attending school"); discussion, *supra*, p. 11-13. Tellingly, Plaintiffs do not cite a single case in which a court has held that an individual's right to "refuse unwanted medical treatment" has overridden or invalidated a vaccination mandate.

It is also important to precisely define what liberty interest is truly at stake in this case. *See Glucksberg*, 521 U.S. at 720-21 (a "careful description" of the asserted liberty interest is imperative in the analysis). In the first place, "[t]he university policy isn't forced vaccination. The students have options – taking the vaccine, applying for a religious exemption, applying for a medical exemption, . . . taking a semester off or attending another university." *Klaassen I*,

2021 WL 3073926 at *44.  Plaintiffs here can also remain enrolled at the University and take on-line classes where available.  De Veau Decl., ¶ 18; Packard Decl., ¶ 27.  In other words, they can readily refuse to obtain the "unwanted medical treatment" about which they complain.  *See Doe v. Zucker*, 2021 WL 619465, *21 (N.D.N.Y. 2021) (rejecting argument that vaccine infringed on parents' and students' right to "refus[e] unwanted medical treatment" because vaccine policy "do[es] not force parents to consent to vaccination of their children.")  In the second place, the "treatment" that Plaintiffs wish to avoid does not affect only their self-contained, personal interests.  On the contrary, as the district court in the *Klaassen* case emphasized, whereas "both *Cruzan* and *Glucksberg* were limited to an individual's choice related to the refusal of lifesaving subsistence or medical treatment – with no ramifications to the physical health of others[,] [v]accines address a collective enemy, not just an individual one."  *Klaassen I*, 2021 WL 3073926 at *24.  The fact that the Commonwealth of Massachusetts is dealing with an ongoing public health crisis, fighting through a deadly pandemic, only serves to amplify this critical distinction.  *See Cruzan*, 497 U.S. at 279 (any asserted liberty interest must be "balanc[ed] . . . against the relevant state interests.").[14]

### 4.    Rational Basis Review Applies in this Case.

Because no fundamental rights are implicated in this case, the Court should review the Vaccine Requirement under the conventional "rational basis" standard.  *See Klaassen I*, 2021 WL 3073926 at *21 ("Though *Jacobson* was decided before tiers of scrutiny, it effectively endorsed – as a considered precursor – rational basis review of a government's mandate during a health crisis.") (citing *Roman Catholic Diocese*, 141 S.Ct. at 70 (Gorsuch, J., concurring));[15]

---

[14]    Although Plaintiffs do not claim otherwise, it should be noted that they also do not have a fundamental right to an education generally, s*ee San Antonio Independent Sch. Dist., v. Rodriguez*, 411 U.S. 1, 35-40 (1973), or to a college education specifically.  *Klaassen I*, 2021 WL 3073926, at *22 (citing cases).

[15]    Plaintiffs seems to suggest that, because strict scrutiny was applied by the Supreme Court in the *Roman Catholic Diocese* case, this somehow means that strict scrutiny is the applicable standard here.  Pls. Memo at 16.  Again, this is simply wrong.  As discussed, *supra*, n. 8, the *Roman Catholic Diocese* case involved restrictions on religious institutions, implicating fundamental rights under the First Amendment, thereby causing the Court to apply strict scrutiny.  *Roman Catholic Diocese*, 141 S. Ct. at

*Phillips*, 775 F.3d at 542 n. 5 (noting that "no court appears ever to have held" that "*Jacobson* requires that strict scrutiny be applied to immunization mandates.")  Under rational basis review, "[a] law survives . . .  so long as [it] is rationally related to a legitimate governmental interest," *Cook v. Gates*, 528 F.3d 42, 55 (1st Cir. 2008).  As such, a governmental defendant need only present "plausible reasons" supporting the challenged action, *U.S. R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980), and show that the State action does not "rest[] on grounds wholly irrelevant to the achievement of the State's objectives." *Heller v. Doe*, 509 U.S. 312, 324 (1993) (internal quotations omitted).  "Once a rational basis is identified, [a court] must uphold the statute or regulation even in cases when there is no empirical data in the record to support the assumptions underlying the chosen remedy." *Medeiros v. Vincent*, 431 F.3d 25, 31 (1st Cir. 2005).  Moreover, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged [action] actually motived the [enacting authority]." *F.C.C. v. Beach Communications, Inc*., 508 U.S. 307, 315 (1993).  The choice of the enacting authority "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Id*.

### 5.   The Vaccine Requirement Easily Satisfies Rational Basis Review.

Here, the Vaccine Requirement is rationally related to a legitimate government interest. "Stemming the spread of COVID-19 is unquestionably a compelling interest," *Roman Cath. Diocese*, 141 S. Ct. at 67.  And with the continued threat posed by COVID-19, and specifically the Delta Variant, there is good reason "to believe that, absent concerted vaccination, the fall and winter months will prove more arduous than the summer months for the [U]niversity." *Klaassen I*, 2021 WL 3072926, at *26.  *See also* Green Decl., ¶¶ 46-48.  Moreover, as a matter of fact and common sense, COVID-19 poses an especially severe threat in a congregate setting, such as the University, where students live, study, and eat together in close proximity.[16]  Importantly, the

---

66.  It is entirely distinguishable from this case, which involves a neutral and generally applicable restriction on campus access for those who are unvaccinated.  *See Klaassen I*, 2021 WL 3073926 at *20.

[16]      *See* https://www.cdc.gov/coronavirus/2019-ncov/community/shared-congregate-house/guidance-shared-congregate-housing.html

virus poses not only a risk to the student body, but also to faculty and staff at the University, and to individuals in the surrounding communities.  Green Decl., ¶¶ 66-69.  This larger population includes thousands of older people, who are at greater risk of having a severe reaction to COVID-19.  *Id*., ¶ 68.

In these circumstances, requiring vaccination for its students is a sensible and effective way for the University to control the virus on its campuses.  As discussed *supra*, p. 4-6, the CDC has declared that the COVID Vaccines are safe and the most effective way to prevent the spread of COVID-19, and there is ample evidence in the public record to support these conclusions.  Over 357 million doses of the vaccine have been administered in the United States, with the incidence of adverse effects extremely low.  *See* discussion, *supra*, p. 4.  Surely, it was "rational" for the University to rely on the judgment and recommendations of the nation's highest authority on infectious diseases.[17]   And while it is true that the COVID Vaccines have not been given final FDA approval, the fact is that, under the EUA process governing these particular vaccines, "the FDA informed manufacturers that it expected the same level of endpoint efficiency data as required for full approval, enough safety data to justify by clear and compelling evidence the vaccine's safety, and confirmation of the technical procedures and verification steps to support full approval."  *Klaassen I*, 2021 WL 3073926, at *8.  In setting these exacting standards, "the FDA invited EUA applications only for vaccines positioned well to receive full approval."  *Id*. (describing testing of COVID Vaccines).  In other words, "[t]his wasn't just any ordinary EUA process, but EUA on proverbial steroids."  *Id*. at *36.  *See also* Green Decl., ¶¶ 26-28.

Defendants have also made reasonable calibrations to the Vaccine Requirement, allowing for medical and religious exemptions, and allowing students to continue their studies by taking on-line classes where available.  Moreover, Plaintiffs' argument that the Vaccine Requirement is

---

[17]     In this regard, it is notable that the Massachusetts Department of Public Health has also enthusiastically endorsed the COVID Vaccines (https://www.mass.gov/info-details/trust-the-facts-get-the-vax), and an independent, non-governmental task force of infectious disease specialists from major academic hospitals across the Commonwealth evaluated the safety and efficacy of each of the COVID vaccines and, in each case, unanimously recommended that the Commonwealth deploy the vaccine (https://www.mass.gov/info-details/massachusetts-covid-19-vaccination-data-and-updates#vaccine-emergency-use-authorization-).

irrational because it "only require[s] students to be vaccinated, but not the staff and faculty that interact with them," Pls. Memo at 17, fails as a matter of fact and law.  As discussed, *supra*, pp. 8-9, the University of Massachusetts generally, and UMass Boston and UMass Lowell specifically, have taken a number of concerted actions to require faculty, staff, and vendors to be vaccinated.  While this process is complicated by the need to reach agreement with labor unions for certain employees, UMass Boston and UMass Lowell are in discussions with such unions to implement a vaccine requirement.  In any event, under rational basis review, a government actor is fully entitled to draw lines and make classifications, and "the fact that [an order] may be overinclusive or underinclusive with regard to its goal does not signify that a rational relationship is lacking."  *Baker v. City of Concord,* 916 F.2d 744, 755 (1st Cir. 1990).  Ultimately, a governmental action "must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *FCC v. Beach Communications, Inc*. 508 U.S. 307, 313 (1993).

Plaintiffs nevertheless seek to challenge the wisdom and efficacy of the Vaccine Requirement, claiming that (a) "the dangers from the vaccines can be incredibly serious," (b) "college-aged individuals have a low risk of infection and serious side-effects or death from COVID-19," and (c) other "risk-mitigation measures," such as mask-wearing and physical distancing are just as "effective" in controlling COVID-19.  Pls. Memo at 9-10, 17.  This line of attack – essentially that a particular vaccination requirement constitutes "bad policy" -- has been frequently made by litigants and uniformly rejected by the courts.  As far back as *Jacobson*, the Supreme Court addressed plaintiff's evidence in that case that "had no purpose except to state the general theory of those of the medical profession who attach little or no value to vaccination as a means of preventing the spread of smallpox, or who think that vaccination causes other diseases of the body."  *Jacobson*, 197 U.S. at 30.  Citing to the fact "that an opposite theory accords with common belief and is maintained by high medical authority," the Court dismissed plaintiff's argument, explaining that "***[i]t is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease***."  *Id*. (emphasis added).  *See also Phillips*, 775 F.3d at 542 ("Plaintiffs

argue that a growing body of scientific evidence demonstrates that vaccines cause more harm to society than good, but as *Jacobson* made clear, that is a determination for the legislature, not the individual objectors."); *Doe v. Zucker*, 2021 WL 619465, *21 (N.D.N.Y. 2021) (in vaccine context, state policymaker has the prerogative "to choose between opposing theories within medical and scientific communities in determining the most effective . . . way in which to meet and suppress public health threats.") (internal quotations omitted).  The bottom line is that University officials have the discretion to make judgment calls to protect the health and well-being of their campus communities, notwithstanding that certain individuals may disagree or find fault with these decisions.  Indeed, it is "when [state] officials undertake[] to act in areas fraught with medical and scientific uncertainties," that their latitude "must be especially broad.")  *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, C.J., concurring) (internal quotations omitted).

### E.    The Vaccine Requirement Does Not Contravene Federal or State Law

Interspersed throughout Plaintiffs' preliminary injunction papers – but not always connected to any particular cause of action -- are various assertions that "defendants' employment of [the Vaccine Requirement] exceeds their authority under state and federal law. . . ."  Pls. Memo at 14.  These "lack of authority" arguments are meritless, and insofar as they refer to state law, are flatly barred by the Eleventh Amendment.

### 1.    Federal Law Presents No Impediment to the University's Actions.

Plaintiffs' arguments under federal law come in two flavors.  First, they argue that the Vaccine Requirement is not "consistent with . . . federal public health guidelines," pointing out that "there is no federal mandate for vaccination against COVID-19," that federal workers are not required to take the vaccine, and that President Biden has initiated a "College Vaccine Challenge" which encourages colleges and universities to promote the COVID vaccine, but does not say that they should mandate it.  Pls. Memo at 4-5.  This argument is both misleading and irrelevant.  First of all, the federal CDC has pronounced that "[e]veryone aged 12 years and older should get a COVID-19 vaccination as soon as possible" and that universities should "encourag[e] vaccinations," so Defendants' Vaccine Requirement is entirely aligned with the

federal government's public health objectives.[18]  President Biden has also recently announced that every federal government employee and onsite contractor will be asked to attest to being fully vaccinated, with unvaccinated individuals being subjected to various work-related restrictions.[19]  But this aside, the more fundamental problem with Plaintiffs' argument is that state actors have the clear prerogative to adopt public health and safety measures that are attuned to the specific threats and circumstances within their borders, regardless of what the federal government does or does not do nationwide.  This was the essential lesson of *Jacobson*, which held that, as far as "safeguard[ing] the public health and public safety," the "mode or manner in which [the] results are accomplished is *within the discretion of the state*."  197 U.S. at 25 (emphasis added).  Indeed, the CDC itself has stated that "whether a state, local government, or employer, for example, may require or mandate COVID-19 vaccination is a matter of state or other applicable law."[20]

Plaintiffs also argue that the Vaccine Requirement violates the informed consent requirement of 21 U.S.C. § 360bbb-3(e), pertaining to medical products, such as the COVID vaccines, that are authorized under the FDA's EUA program.  Pls. Memo at 5-6.  Plaintiffs interpret this federal statute as "stat[ing] that individuals cannot be mandated to receive the vaccine," *id*. at 6, referring specifically to language in 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III) that directs the FDA to impose conditions on an EUA "designed to ensure that individuals to whom the product is administered are informed . . . of the option to accept or refuse administration of

---

[18]     *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html and https://www.cdc.gov/coronavirus/2019-ncov/community/colleges-universities/considerations.html

[19]     *See* https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-president-biden-to-announce-new-actions-to-get-more-americans-vaccinated-and-slow-the-spread-of-the-delta-variant/

[20]     *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/essentialworker/workplace-vaccination-program.html.  The U.S. Equal Employment Opportunity Commission has likewise confirmed that "[t]he federal [equal employment opportunity] laws do not prevent an employer from requiring all employees physically entering the workplace to be vaccinated for COVID-19."  *See* https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (Q&A, K.1)

the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and their benefits and risks."  This argument, however, misconstrues the nature and impact of the relevant statutory provision, as confirmed by a recent federal court decision (*Bridges v. Houston Methodist Hospital*, 2021 WL 2399994, *2 (S.D. Tex. 2021)) and by a lengthy opinion issued just last month by the Office of Legal Counsel of the Department of Justice ("OLC").[21]

Section 360bbb-(e)(1)(A) "confers certain powers and responsibilities to the Secretary of Health and Human Services in an emergency."  *Houston Methodist Hosp.*, 2021 WL 2399994 at *2.  It specifically requires the Secretary to impose certain conditions on persons, including medical providers, who are "carry[ing] out an activity for which [an EUA] is issued," including conditions "designed to ensure that individuals to whom the product is administered are informed" of certain facts and circumstances.  21 U.S.C. § 360bbb-3(e)(1)(A).  In connection with the roll-out of the COVID vaccines, the Secretary complied with these requirements, requiring that potential vaccine recipients receive Fact Sheets informing them of their right "to receive or not receive" the vaccine.  OLC Opinion, pp. 6, 8.  Importantly, however, the statute "neither expands nor restricts the responsibilities of [third parties]; in fact, it does not apply at all to [such parties] . . . ."  *Houston Methodist Hosp.*, 2021 WL 2399994 at *2.  It likewise "does not confer a private opportunity to sue the government, employer, or worker."  *Id*.  *See also Klaassen I*, 2021 WL 3073926, at *25 ("The students admit that the informed consent requirement under the EUA statute only applies to medical providers.")[22]  In light of all of this, the OLC has recently opined that:

---

[21]        *See* Memorandum Opinion from Office of Legal Counsel of the Department of Justice, "Whether Section 564 of the Food, Drug and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an [EUA]," July 6, 2021 ("OLC Opinion") (attached hereto as Exhibit A).

[22]        Note that, while the district court in the *Klaassen* case discussed 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III) at some length, it did not have occasion to directly address the argument that the "option" clause in the statute flatly prohibits third parties from imposing vaccination requirements. *Klaassen I*, 2021 WL 3073926, at *25, 34.  In upholding Indiana University's vaccination requirement,

> [Section 360bbb-3(e)(1)(A)(ii)(III)] concerns only the provision of information to potential vaccine recipients *and does not prohibit public or private entities from imposing vaccination requirements for vaccines that are subject to the EUAs*. By its terms, the provision directs only that potential vaccine recipients be "informed" of certain information, including the "option to accept or refuse administration of the product."

OLC Opinion, p. 7 (emphasis added). In its opinion, the OLC noted that "FDA agrees with our interpretation of [Section 360bbb-3]." *Id*. at 13.[23]

It should be emphasized that the above-stated interpretation of Section 360bbb-3(e)(1)(A)(ii)(III) does not serve to make the "option" clause in the statute a nullity. That clause "continues to be a true statement about a material fact of importance to potential vaccine recipients – virtually all such persons continue to have the 'option' of refusing the vaccine in the sense that there is no direct legal requirement that they receive it." OLC Opinion, pp. 10-11. This is surely true with respect to the Plaintiffs, who have the option of declining to take the COVID vaccine and pursuing educational or other opportunities outside the UMass campuses, or taking on-line classes at UMass where available. *See Klaassen II*, 2021 WL 3281209, at *1 (Indiana University vaccine requirement "does not require" anyone to be vaccinated; "[p]eople who do not want to be vaccinated may go elsewhere."); *Houston Methodist*, 2021 WL 2399994, at *2 (noting that an employer's vaccination policy was not "coercive" because an employee "can freely choose to accept or refuse a COVID vaccine; however, if she refuses, she will simply need to work somewhere else.") Indeed, the language of Section 360bbb-3(e)(1)(A)(ii)(III) itself provides that vaccine recipients should be informed of "the consequences, if any, of refusing administration of the product . . . ." The fact there may be "consequences" for vaccine refusal is

---

however, the inescapable conclusion is that neither the district court nor the Court of Appeals for the Seventh Circuit did not view the federal statute as restricting Indiana's rights in this regard.

[23]    While it is perhaps arguable that the OLC opinion, when combined with FDA's agreement with it, is entitled to *Chevron*-level deference, there is precedent for courts at least  "properly resort[ing] for guidance" to OLC opinions under the "softer" deference framework of *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944).  *See Bragdon v. Abbott*, 524 U.S. 624, 642-44 (1998).

fully consistent with the idea that third parties can impose vaccine conditions on continued employment or school attendance.  *See* OLC Opinion, p. 9.[24]

### 2.     The Vaccine Requirement Does Not Violate State Law

Plaintiffs also claim that the Vaccine Requirement exceeds the University's powers under state law, pointing out that the vaccination requirement at issue "has not been mandated by the Department of Public Health" (under M.G.L. c. 76, § 15) or by the "local Boards of health within the Commonwealth" (under M.G.L. c. 111, § 181).  Pls. Memo at 14-15.

This argument is, first of all, entirely barred by the Eleventh Amendment.  Under the Eleventh Amendment, "[i]t is not the proper purview of a federal court to supervise state officials' compliance with state law."  *O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 44 (1st Cir. 1998).  *See also Diaz-Fonesca v. Puerto Rico*, 451 F.3d 13, 43 (1st Cir. 2006) (noting that while *Ex Parte Young*, 209 U.S. 123 (1908) "permits injunctive relief based on federal constitutional claims, it does not allow injunctive relief against state officials for violation of state law. . . .")  Indeed, as the Supreme Court has stated, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials how to conform their conduct to state law."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).  Just yesterday, in a similar case involving a vaccination requirement imposed by the University of Connecticut, a federal court dismissed all claims "to the extent that the plaintiffs base their claims on alleged violations of state law rather than federal law."  *Wade v. Univ. of Connecticut*, No. 21-cv-924 (D. Conn. August 16, 2021) (attached hereto as Exhibit B).  The Court should do the same here.[25]

---

[24]     As a corollary point, the OLC observed that "if Congress intended to restrict entities from imposing EUA vaccination requirements, it chose a strangely oblique way to do so, embedding the restriction in a provision that on its face requires only that individuals be provided with certain information . . . Congress could have created such a restriction by simply stating that persons (or certain categories of persons) may not require others to use an EUA product."  OLC Opinion, pp. 9-10.

[25]     Although the Plaintiffs have challenged the Vaccine Requirement in part through § 1983, it is well settled that that statute does itself not abrogate states' Eleventh Amendment immunity.  *See, e.g., Quern v. Jordan*, 440 U.S. 332, 341 (1979) (rejecting argument that "Congress intended . . . § 1983 to override the traditional sovereign immunity of the states.").

Even if the Court were to address Plaintiffs' contentions under state law, they have no merit.  The statutes that Plaintiffs rely upon do not speak to the issue at hand.  Sections 15 and 15C of Chapter 76 of the General Laws mandate that certain immunizations shall be required as a condition of attending school across the Commonwealth.  Section 181 of Chapter 111 separately provides that local boards of health in the Commonwealth may require and enforce vaccination measures.  These statutes do not purport to be the exclusive and all-encompassing sources of vaccination powers for governmental entities in the Commonwealth, and certainly none of the statutes limit, or even speak to, the authority of public universities to govern the conduct of their students within the confines of their campuses in order to protect their health and safety.[26]

The laws actually governing the University further undermine Plaintiffs' claim that Defendants are beholden to other state actors in implementing vaccine measures, while empowering the Presidents and Chancellors to take the action that they did.  Section 1 of Chapter 75 of the General Laws (governing UMass) specifically provides that the Board of Trustees of the University "shall have all authority, responsibility, rights, privileges, powers and duties customarily and traditionally exercised by governing boards of institutions of higher learning" and that, in exercising these powers, it "shall not in the management of the affairs of the university *be subject to, or superseded by,* any other state agency, board, bureau, commission, department or officer . . .," with limited exceptions not applicable here.  M.G.L. c. 75, § 1.  The Board, in turn, is authorized to delegate its duties and powers "to the president and other officers of the university," M.G.L. c. 75, § 3A, and it has broadly exercised this power through a longstanding resolution on University governance called the "Wellman Document."  See Exhibit C attached hereto.  The Wellman Document provides, *inter alia*, that the President and Chancellors are the "executive officer[s]" of the University and its campuses, respectively, and

---

[26]     *Cf. Garcia v. New York City Dept. of Health & Mental Hygiene*, 31 N.Y.3d 601, 619-20 (2018) (holding that flu vaccine rules of local health board "do not conflict with" provisions of state law:  The state law "provisions are directed to the powers and duties of the Commissioner of [the New York State Department of Health], not of the Board" and they "reveal no intent to restrict the Board's authority to regulate vaccinations.")

are charged with "promot[ing] the general welfare" of the University and the campuses.  These powers necessarily encompass the adoption of health and safety measures, as there is nothing more fundamental to the "general welfare of the campus" as ensuring the physical well-being of those on campus.  Indeed, as a matter of law in Massachusetts, while "[t]he primary mission of universities is academic in nature . . . [t]hey are also property owners and landlords responsible for their students' physical safety on campus."  *Nguyen v. M.I.T.*, 479 Mass. 436, 450 (2018).  Each university "has a special relationship with its students, and a corresponding duty to take reasonable measures to protect students" from physical harm.  *Helfman v. Northeastern Univ.*, 485 Mass. 308, 321 (2020).  Having been charged with such a duty, it would be nonsensical to claim that the University here lacks the concomitant powers to carry it out.  *See State ex rel. Holcomb v. Armstrong*, 39 Wash.2d 860, 865, 239 P.2d 545 (1952) (grant of power to university regents of "full control of the university" impliedly includes "power to make and enforce reasonable health regulations," as "[t]he protection and improvement of the health and physical condition of the students is as much the responsibility of the [University] as is their mental training and development"); *Klaassen II*, 2021 WL 3281209, at *2 ("Each university may decide what is necessary to keep other students safe in a congregate setting . . .  A university will have trouble operating when each student fears that everyone else may be spreading disease.").

### F.   Defendants' Denial of Plaintiff Cluett's Request for a Religious Exemption Did Not Violate Her Constitutional or Statutory Rights (Count III).

Plaintiffs also cannot succeed on their claims based on the University's denial of Cluett's religious exemption request.  Count III of the Complaint lists several federal and state laws that Plaintiffs claim were violated: (1) 42 U.S.C. § 2000bb-1, (2) the First Amendment, (3) the Fourteenth Amendment, (4) G.L. c. 76 and 105 C.M.R. 220.500, and (5) Articles I and II of the Massachusetts Constitution.  Complaint, ¶¶ 69, 77–78.  Plaintiffs' preliminary injunction papers do not differentiate between these different claims, instead just summarily stating that Cluett has a right to assert a religious exemption and that the UMass Boston defendants were "clearly in error" for denying her exemption "based on criteria that violates state and constitutional law."

28

Pls. Memo at 20.  As explained below, Plaintiffs are not likely to succeed on the merits of any of these theories of violations of federal or state law.

### 1.     Federal Claims

#### a.     Plaintiffs Have No Viable Clam that Defendants' Denial of Plaintiff Cluett's Request for a Religious Exemption Violates 42 U.S.C. § 2000bb-1.

As an initial matter, Plaintiffs cannot succeed on any religious exemption claim based on an alleged violation of the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1, because 42 U.S.C. § 2000bb-1 does not apply to the states.  *City of Boerne v. Flores*, 521 U.S. 507, 532–36 (1997) (holding that Congress exceeded its Fourteenth Amendment authority in applying RFRA to the states).  Because the University defendants are state actors, *see supra*, p. 26, Plaintiffs cannot assert a cause of action against them under RFRA.

#### b.     Defendants' Denial of Plaintiff Cluett's Request for a Religious Exemption Did Not Violate Her First Amendment Free Exercise Rights.

Plaintiffs also cannot succeed on the merits of their claim that the denial of Cluett's religious exemption request violated her free exercise rights under the First Amendment.  First, UMass Boston committed no free exercise violation in its treatment of Cluett's request for a religious exemption.  Second, and in any event, Cluett has no inherent First Amendment right to be exempted from the Vaccine Requirement based on her stated religious beliefs.

##### i.     UMass Boston's Denial of Plaintiff Cluett's Request for a Religious Exemption Was Proper and Did Not Violate Her Right to the Free Exercise of Religion.

Plaintiff Cluett is not likely to succeed on the merits of her claim that the University's response to her exemption request violated her right to the free exercise of religion under the First Amendment.  Where, as here, a state actor chooses to provide a religious exemption to state vaccination requirements for sincerely held religious beliefs, it does not violate individuals' free exercise rights for the state actor to determine that their objection to the vaccine is based on personal or secular reasons, and not religious considerations.  *Mason v. Gen. Brown Cent. Sch. Dist.*, 851 F.2d 47, 51–52 (2d Cir. 1988); *Farina v. Bd. of Educ.*, 116 F. Supp. 2d 503, 508

(S.D.N.Y. 2000); *NM v. Hebrew Acad. Long Beach*, 155 F. Supp. 3d 247, 257–59 (E.D.N.Y. 2016); *Caviezel v. Great Neck Pub. Schs.*, 701 F. Supp.2d 414, 427–30 (E.D.N.Y 2010). "Court[s] may, as in any state of mind inquiry, draw inferences from the plaintiffs' words and actions, in determining whether they hold genuine and sincere religious beliefs against inoculations." *Farina*, 116 F. Supp. 2d at 508. Even when the facts show that a plaintiff is devoutly religious, denial of an exemption is appropriate where the plaintiff's opposition to vaccination is a selective personal belief, as opposed to a religious one. *NM*, 155 F. Supp. 3d at 258; *Caviezel*, 701 F. Supp.2d at 429–30.

Importantly, an individual's assertion that his or her belief is religious does not automatically make it so. *Mason*, 851 F.2d at 51; *see Sherr v. Northport-East Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 94 (E.D.N.Y. 1987). "To the contrary, 'a threshold inquiry into the "religious" aspect of particular beliefs and practices cannot be avoided,' if [courts] are to determine what is in fact based on religious belief, and what is based on secular or scientific principles." *Mason*, 851 F.2d at 51 (internal citations omitted). Here, for several important reasons enumerated below, Plaintiffs are unlikely to succeed on a claim that Defendants violated Cluett's First Amendment rights by denying her requested religious exemption.[27]

*First*, the Complaint and Cluett's Verification and Affidavit lack any description of Cluett's asserted religious belief or the reasons that the belief prohibits her from receiving a vaccine. There are simply conclusory statements that should be afforded no weight by the Court. Complaint, ¶ 67 ("Plaintiff Cluett has a sincerely held religious belief that precludes her from taking the mandated vaccine."); Cluett Verification ¶ 4 ("I qualify for a religious exemption.");

---

[27] While this section discusses facts included in Cluett's submissions to the University in support of her request for a religious exemption, a court acting on a motion to dismiss may review documents relied upon in a complaint, even if not attached, without converting the motion into one for summary judgment. *Clorox Co. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000). Here, because the complaint's factual allegations "are expressly linked to" these documents, the documents "effectively merge[] into the pleadings and the trial court can review [them] in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998). Even if the court were to conclude that this material may only be considered as part of the Opposition to the Motion for a Preliminary Injunction, and not as part of the Motion to Dismiss, Count III is, in any event, subject to dismissal as a matter of law for the reasons stated in Section (I)(F)(1)(b)(ii), *infra*.

*cf. Iqbal*, 556 U.S. at 678 (The Court need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.").

*Second*, in her communications with the University, Cluett associated herself with the Roman Catholic religion, which does not have a tenet prohibiting vaccines.  In Cluett's appeal letter, she details the Catholic practices she has followed since she was a child, including attending religious education, baptism, confession, Holy Communion, and confirmation, as well as that both her parents "are of Christian faith."  De Veau Decl. Ex. G.  Based on her description, De Veau concluded that Cluett was Roman Catholic, and told Cluett that if his understanding of her religion was incorrect to please let him know.  *Id*. ¶ 17, Ex. H.  Cluett did not thereafter tell De Veau that his understanding was incorrect, nor does she allege in her complaint that De Veau was mistaken in understanding her religion to be Roman Catholic.  De Veau's email denying Cluett's appeal provided statements from the United States Conference of Catholic Bishops supporting the ethical use of vaccines in general and the COVID-19 vaccine specifically, and explained that he did "not see that there are any specific religious tenets that would prevent someone of the Roman Catholic faith from receiving a vaccine, if they chose to do so."  *Id.*  De Veau further explained that without documentation indicating that a religious tenet of the Roman Catholic faith prevents individuals from receiving a vaccine, or a personally written statement describing the religious basis for Cluett's objection to taking this vaccine versus the other vaccines she previously submitted evidence of having received, Cluett's request for an exemption could not be approved.  *Id.*

De Veau's analysis was undoubtedly constitutional, as it simply requested that Cluett provide an explanation of how her opposition to vaccination is based in religious beliefs.  *See Friedman v. Clarkstown Cent. Sch. Dist.*, 75 F. App'x 815, 820 (2d Cir. 2003) (school official did not violate plaintiff's First Amendment rights by asking plaintiff to submit documentation describing the basis for her religious objection to immunizations).  Cluett's appeal letter failed to

provide such an explanation.[28]  Moreover, it was entirely appropriate for De Veau to have juxtaposed Cluett's stated association with Roman Catholicism with the actual tenets of that religion.  *See NM*, 155 F. Supp. 3d at 258–59 (where plaintiffs were devoutly religious but there was only "tenuous" evidence connecting plaintiffs' church to the objection to vaccination, it was proper for school to deny plaintiff's request for a religious exemption); *Caviezel*, 701 F. Supp.2d at 429 (upholding denial of plaintiff's religious exemption to school vaccination requirement under state law where plaintiff indicated she was a member of a particular church but there was no evidence that this church opposed vaccinations).[29]

*Third*, Cluett has previously obtained numerous vaccines, including when she was in her late teenage years. De Veau Decl. ¶ 12, Ex. D; *id*., Ex. A, p. 2 (Cluett says "I have received all those vaccines listed on the religious exemption form.").  In fact, on 15 separate occasions, it appears that she received a *voluntary* vaccine (*i.e*., the influenza vaccine) that is not required as a condition of attending school in Massachusetts.  *Id*. Ex. D.[30]  Cluett received some vaccines as recently as 2017 and 2016.  *Id*.  This prior practice obviously undermines Cluett's claim that her objection to being vaccinated is a matter of religious faith.

---

[28] That Cluett included citations to Bible passages in her second written statement does not render her beliefs religious, as simply couching opposition to vaccination in the language of religion is insufficient where the facts indicate that a plaintiff's objection to vaccination is based on secular concerns.  *Sherr*, 672 F. Supp. 94; *Fallon*, 877 F.3d at 492; *Farina*, 116 F. Supp. 2d at 508.

[29]  Plaintiffs' citation to *Dalli v. Bd. of Educ*., 358 Mass. 753 (1971) in support of their claim, Complaint, ¶ 76, is misplaced.  In *Dalli*, the Supreme Judicial Court of Massachusetts struck down (since amended) language in the religious exemption section of M.G.L. c. 76, § 15, because it limited exemptions to those who subscribed to the "tenets and practice of a *recognized* church or religious denomination." *Id*. at 758-59 (emphasis added).  *Dalli*'s holding is inapposite to Cluett's situation, where the denial of her religious exemption request was not based on whether she was a member of a recognized religion. *See Morin*, 2002 WL 31441509, at *5 (distinguishing *Dalli* where denial of exemption did not "turn" on plaintiff's membership or not in a recognized religion, but rather "secular" nature of vaccination beliefs).

[30] Cluett's immunization records are attached to De Veau's Declaration pursuant to the Family Educational Rights and Privacy Act Regulations (FERPA) exemption that applies when a student initiates legal action against an educational institution. 34 C.F.R. § 99.31(9)(iii)(B) ("If a parent or eligible student initiates legal action against an educational agency or institution, the educational agency or institution may disclose to the court, without a court order or subpoena, the student's education records that are relevant for the educational agency or institution to defend itself.").

*Fourth*, much of Cluett's stated objection to the vaccine is focused on medical, health, and lifestyle reasons, which are personal and not religious.  Where a plaintiff cites no controlling religious tenet, and opposition to a vaccine is based on concern over one's health, courts have found that such beliefs are personal and secular, such that states may constitutionally deny requests for religious exemptions to violations.  *See Farina*, 116 F. Supp. 2d at 508, 513; *Sherr*, 672 F. Supp. at 95–96; *NM*, 155 F. Supp. 3d at 258–59; *Caviezel*, 701 F. Supp.2d at 429–30; *Morin v. MGH*, 2002 WL 31441509, *5 (Mass. Super. Ct. 2002) (unreported).

Cluett's description of her belief opposing vaccination indicates that the belief is based on a personal conviction that her body is a temple and she should live a healthy lifestyle, which to her means relying on naturopathic medicine.[31]  De Veau Decl. Ex. G.  These statements reflect secular personal beliefs, rather than religious ones.  *See Mason*, 851 F.2d at 51–52 (finding that plaintiffs' "health-oriented" belief in "a natural view of the human body" and rejection of "various types of drug and surgical intervention in favor of a belief that 'health comes from within'" was secular in nature, and not entitled to a religious exemption offered under state law); *Fallon v. Mercy Catholic Med. Ctr. of Se. Pa.*, 877 F.3d 487, 492–93 (3d Cir. 2017) (holding that a personal conviction that one should not harm their body did not qualify for a sincerely held religious exemption).  In fact, Cluett's description of her reasons for opposing the COVID-19 vaccination are very similar to plaintiffs' reasons in cases where courts have held that the requested religious exemption to a school vaccination requirement was properly denied because the opposition to vaccination was based in secular, personal beliefs.  Cluett's similar statements include:

(1) "God has given me control over my body to live according to His plan."  De Veau Decl. Ex. B.  *See Check v. New York City Dep't of Educ.*, 2013 WL 2181045, *7, 10 (E.D.N.Y. May 20, 2013) (plaintiff stated that she waits on the word of God to tell her what to do in a particular situation and that she "would go and reach for God and ask [H]im for the answers . . . . reaching for [H]is guidance" on vaccinations);

---

[31] Merriam-Webster defines "naturopathy" as "a system of treatment of disease that avoids drugs and surgery and emphasizes the use of natural agents (such as air, water, and herbs) and physical means (such as tissue manipulation and electrotherapy).  https://www.merriam-webster.com/dictionary/naturopathy

(2) "I am not to corrupt my blood or my immune system that was designed in His perfect image.  These COVID-19 vaccines are against God's will for my life, and I am not to corrupt God's temple."  De Veau Decl. Ex. G.  *See Farina*, 116 F. Supp. 2d at 506 ("God designed our bodies to have immune systems, which must not be defiled by immunizations."); *Check*, 2013 WL 2181045, at *7 (plaintiff believed that the body "is a gift from God . . . if we defile that, then we are going against [H]im");

(3) "After lengthy consideration and review, I have come to the firm conviction that I am not going to pollute my body (which I consider a temple of God) with any COVID-19 injections." De Veau Decl. Ex. G.  *See Fallon*, 877 F.3d at 492 (plaintiff believed that "one should not harm their [sic] own body and strongly believes that the flu vaccine may do more harm than good.");

(4) "I have considered this deeply and at length and have come to the firm conviction that subjecting myself to a vaccine that I do not have satisfactory faith in would be a violation of God's intentions for my life."  De Veau Decl. Ex. B.  *See Check*, 2013 WL 2181045 at *7–*8 (describing the "chemicals and the toxins that are put into these vaccines" as "poison to our bodies" that are "manmade" and "not created by God," expressing concerns about the medical effects the vaccine might cause, and explaining that she did research on immunizations and concluded that they were not correct for her children);

(5) " . . . I respect the free will that God has given all of us to choose what is in line with His will.  His will for my life is not to take these pharmaceutical agents."  De Veau Decl. Ex. G.  *See Check*, 2013 WL 2181045 at *7–*8; *Fallon*, 877 F.3d at 492 (plaintiff expressed that consenting to vaccination would violate his conscience as to what is right and what is wrong);

(6) "1 Corinthians 3:17 speaks to the importance of following my convictions as it relates to the COVID-19 vaccinations: 'If anyone destroys God's temple, God will destroy him.  For God's temple is holy, and you are that temple.'"  De Veau Decl. Ex. G.  *See Farina*, 116 F. Supp. 2d at 506 (quoting 1 Corinthians 3:17).

These concerns are personal medical convictions separate from Cluett's stated religious practice. *See Farina*, 116 F. Supp. 2d at 508; *Fallon*, 877 F.3d at 492–93; *Check*, 2013 WL 2181045 at *10–*11.

*Fifth*, Cluett's social media posts concerning her opposition to receiving the vaccine indicate that Cluett's beliefs opposing vaccination are personal, and perhaps political.  On April 27, 2021, the University received a screenshot of Cluett's comments on the UMass Boston social media post announcing the University's Vaccine Requirement. De Veau Decl. ¶ 19, Ex. I.  Cluett wrote: "Opinions on vaccine safety aside medical tyranny is alive and well, this is fascist insanity from the most far leftist leaning university system in the state.  My family's hard earned taxpayer

dollars have funded this institution my entire life.  I will be showing up to campus unvaccinated [emoji smiley face]."  *Id.*  These statements further affirm that Cluett's opposition to vaccination is rooted in personal, rather than religious, convictions.  *Fallon v. Mercy Catholic Med. Ctr. of Se. Pa.*, 200 F. Supp. 3d 553, 563 (E.D. Pa. 2016) (opposition to vaccination that is personal, political, sociological and economic is "the very definition of secular philosophy as opposed to religious orientation"), *aff'd*, *Fallon*, 877 F.3d 487.

### ii.  Even if the University Had Not Offered Any Religious Exemption, the Vaccine Requirement Would Not Have Violated Plaintiff Cluett's First Amendment Rights.

In any event, even if Cluett could establish that UMass Boston should have approved her request for a religious exemption (she cannot), this would not amount to a First Amendment free exercise violation.  This is because "*[c]onstitutionally*, [Cluett] has no right to an exemption" in the first place.  *Nikolao v. Lyon*, 875 F.d 310, 316 (6th Cir. 2017) (emphasis added).  Federal courts have consistently ruled that, even where there is *no exemption* for sincerely held religious beliefs, mandatory vaccination as a condition for admission to school does not violate the Free Exercise Clause.  *See*, *e.g.*, *Caviezel v. Great Neck Pub. Sch.*, 739 F. Supp. 2d 273, 285 (E.D.N.Y. 2010) ("[T]he free exercise clause of the First Amendment does not provide a right for religious objectors to be exempt from [the state] compulsory inoculation law.").  The Supreme Court has explained that:

> [A state's police power] is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience.  Thus [a parent] cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds.  The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.

*Prince*, 321 U.S. at 166-67 (1944).  *See also Workman*, 419 F. App'x at 353-54 ("[F]ollowing the reasoning of *Jacobson* and *Prince*, we conclude that the West Virginia statute requiring vaccinations as a condition of admission to school does not unconstitutionally infringe [plaintiff's] right to free exercise.") (collecting cases); *Phillips*, 775 F.3d at 543 ("New York law goes beyond what the Constitution requires by allowing an exemption for parents with genuine

and sincere religious beliefs."); *Klaassen I*, 2021 WL 3073926, at *25 (stating that the law views

the university's adoption of a religious exemption to a vaccine mandate, "as a matter of grace");

*Whitlow*, 203 F.Supp.3d at 1084 (upholding California law that removed religious exemption to

vaccination mandate, stating that "it is clear that the Constitution does not require the provision

of a religious exemption to vaccination requirements . . . .").[32]

### 2.    State Law Claims

#### a.    The Eleventh Amendment Bars Plaintiff Cluett's State Law Claims.

As previously discussed with respect to the state law claims raised against the Vaccine

Requirement generally, *supra,* Section (I)(E)(2), Plaintiffs' assertion that the denial of her

religious exemption request violates state law is barred by the Eleventh Amendment.  *O'Brien*,

162 F.3d at 44; *Diaz-Fonseca*, 451 F.3d at 43; *Pennhurst*, 465 U.S. at 106.

#### b.    Defendants' Denial of Plaintiff Cluett's Request Does Not Violate M.G.L. c. 76, § 15 or 105 Code Mass. Regs. § 220.500.

Even if the Court were to consider Plaintiff Cluett's state law claims, they fail on the

merits.  Contrary to Plaintiffs' suggestion, *see* Complaint, ¶ 69, Defendants have not taken any

action that is contrary to M.G.L. c. 76, § 15 or 105 Code Mass. Regs. § 220.500.  These laws

govern state-wide immunizations applied broadly to students and schools across the

Commonwealth, which is not what is at issue here.  Moreover, to the extent that they have

relevance to the present case, the University's Vaccine Requirement, in allowing for a religious

exemption, is entirely consistent with them.  Both of these state laws *expressly require* students

to provide written explanation of their religious beliefs to seek a religious exemption for

---

[32] Even if the Court was unpersuaded by this considerable precedent in the vaccination context, Plaintiff's Free Exercise challenge would fail under a standard free exercise analysis because, as a law that does not target or selectively burden religious conduct, the Vaccine Requirement is a neutral law of general applicability that would be subject only to rational basis review.  *See Cavieziel*, 739 F. Supp. 2d at 285 ("Thus, being 'neutral and of general applicability', New York's mandatory school inoculation program need not be justified by a compelling government interest."); *Boone v. Boozman*, 217 F.Supp.2d 938, 953 (E.D. Ark. 2002) ("Because the immunization statute is a neutral law of general applicability, heightened scrutiny is not required even though compulsory immunization may burden plaintiff's right to free exercise.").  The Vaccine Requirement would easily satisfy rational basis review, as vaccination is rationally related to the University's interest in limiting the spread of COVID-19.  *See supra*, pp. 19-22.

mandatory vaccinations, which is exactly what UMass's Vaccine Requirement asked of Cluett. *See* M.G.L. c. 76, § 15, third para.; 105 Code Mass. Regs. § 220.500(C); 220.600(D).

> **c.    Defendants' Denial of Plaintiff Cluett's Request for a Religious Exemption Did Not Violate the Massachusetts Constitution.**

Plaintiff Cluett is also not likely to succeed on the merits of her claim that the University's response to her exemption request violated her right to worship under Article II of the Massachusetts Constitution. *See* Complaint, ¶ 77. Even if Cluett could successfully show that her opposition to vaccination was rooted in religion (which she cannot, *see supra,* pp. 29-35), such religiously motivated conduct would implicate the free exercise of religion, which is distinct from the right to worship protected by Article II. *Soc'y of Jesus of New England v. Com.*, 441 Mass. 662, 676–77 (2004); *Com v. McCormick*, 92 Mass.App.Ct. 1103, *3 (2017).[33] Clearly, here, the University is not dictating how Cluett may worship or what she may believe religiously.

> **G.    Plaintiffs Have No Viable Claim Under 42 U.S.C. § 1983 (Count IV).**

Since Plaintiffs have established no likelihood of success on the various claims discussed above, they likewise cannot succeed on their statutory claim under 42 U.S.C. § 1983. "By its terms, . . . [Section 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). *See also Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) ("In order to prevail on a

---

[33] Even if Plaintiffs were to amend their complaint to add a free exercise claim under the more relevant article of the Massachusetts Constitution, this claim would fail. As discussed previously, Cluett is unable to demonstrate that the University has "burdened" a "sincerely held religious belief" because her opposition to vaccination is rooted in secular, personal beliefs. *Atty. Gen. v. Desilets*, 418 Mass. 316, 322 (1994). Failure to establish such a substantial burden would end the analysis. *Rasheed v. Comm'r of Corr.*, 446 Mass. 463, 472 (2006). Even assuming *arguendo* that Plaintiffs could demonstrate that Cluett's free exercise rights were burdened by the Vaccine Requirement, any infringement on her rights would be permissible under the compelling state interest balancing test. *Soc'y of Jesus*, 441 Mass. at 676. The Vaccine Requirement would easily satisfy the compelling state interest balancing test, because "[s]temming the spread of COVID-19 is unquestionably a compelling interest," *Roman Catholic Diocese*, 141 S.Ct. at 67, and Massachusetts case law indicates that such state interest outweighs an individual's free exercise rights in the school vaccination context. *Com. v. Renfrew*, 332 Mass. 492, 494–95 (1955) (the refusal of a parent to vaccinate his child based on his religious belief was "no defence to a violation of the compulsory school attendance law."); *Com. v. Green*, 268 Mass. 585, 586 (1929) (same).

section 1983 claim, the plaintiff must show that the defendants' conduct deprived him of a federal right.")  For the reasons stated above, Plaintiffs cannot prevail on their federal claims, thereby defeating their Section 1983 claim.[34]

## II.    The Other Preliminary Injunction Factors Strongly Favor Denial of Plaintiffs' Motion.

Where "the moving party cannot demonstrate that [they are] likely to succeed [on the merits], the remaining [preliminary injunction] factors become matters of idle curiosity." *Arborjet*, 794 F.3d at 173. Because Plaintiffs here have not established a likelihood of success on any claim (and, indeed, each claim is subject to dismissal as a matter of law), this Court need not proceed further.  Nevertheless, to the extent this Court considers the other factors, they weigh decisively against the interlocutory relief requested by the Plaintiffs.

### A.    Plaintiffs Have Not Demonstrated Irreparable Harm

"A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.,* 370 F.3d 151, 162 (1st Cir. 2004). "[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm." *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 19 (1st Cir. 1996).  Rather, the threat of irreparable harm must be real and "immediate." *Fundicao Tupy S.A. v. U.S.,* 841 F.2d 1101, 1102–03 (Fed.Cir.1988).  While the threatened loss of constitutional freedoms may constitute irreparable injury, *see, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976), no such loss has occurred or will occur here, for the reasons previously discussed, *supra*, Section I.

"The burden of demonstrating [the existence of] irreparable harm rests squarely upon the movant," *Charlesbank*, 370 F.3d at 162, and Plaintiffs have presented virtually no evidence to meet this burden here.  Specifically, Plaintiff Harris states that the Vaccine Requirement "will force my expulsion" from UMass Lowell if he does not receive the vaccine.  Harris Verification, ¶ 5 [Docket # 1].  Plaintiff Cluett also states that she "face[s] expulsion," while pointing out that

---

[34]      In addition, to the extent that the claims in Count IV are brought against the UMass Lowell and UMass Boston defendants, they "fail because a state and its agencies are not 'persons'" who may be sued under 42 U.S.C. § 1983.  *Brown v. Newberger*, 291 F.3d 89, 92 (1st Cir. 2002).

she is on the track team and is a recipient of the $10,000 Chancellor's Merit Scholarship.  Cluett Verification, ¶ 3, 7 [Docket # 1]; Complaint, ¶ 45.  Beyond this, there is only the conclusory, unverified allegation in Plaintiffs' motion papers that they "will be forced to miss out on their education, which could include financial losses."  Pls. Memo at 18.

The "expulsion" claims are, first of all, false.  If Plaintiffs decline to be vaccinated, they will not be permitted on campus for the Fall 2021 semester, but they will assuredly *not* be subject to disciplinary action, such as expulsion.  De Veau Decl., ¶ 18.  Rather, they are free to re-enroll for classes at their respective UMass campuses at a later date, and they can also potentially take advantage of remote learning options at UMass this Fall.  Indeed, during an August 2, 2021, interview on "Fox & Friends," Harris himself admitted that "I most likely will be able to have on-line classes with this."[35]

In addition, since the Vaccine Requirement was announced three months ago (in late April 2021), Plaintiffs were afforded time to enroll in a different university or college that does not have a COVID vaccine requirement, but they present no evidence of any efforts to do so.[36] They simply complain that they are "prevented from attending any other public college or university within the state," as if Massachusetts public universities were their only option.  They also say nothing about efforts (if any) to pursue temporary employment opportunities while either deferring their education at UMass or seeking enrollment elsewhere.  Relatedly, they offer nothing in support of the claim that they have suffered "financial losses" from the Vaccine Requirement – a form of injury which, in any event, "does not constitute irreparable harm."

---

[35]     *See* https://video.foxnews.com/v/6266227803001#sp=show-clips (starting at 0:37)

[36]     When asked in his Fox & Friends interview whether he has "thought about applying to another school," Harris answered "I have, but I really don't want to.  I want to go back to what I had."  *See* https://video.foxnews.com/v/6266227803001#sp=show-clips (starting at 3:59)

*Micro Networks Corp. v. HIG Hightec, Inc.*, 188 F. Supp. 2d 18, 22 (D. Mass. 2002).[37]  In short, they have not met their burden of proving irreparable injury from the Defendants' actions.

### B.    The Balance of Hardships and the Public Interest Favor Denial of the Requested Injunction

It would be difficult to conceive of a case where the interests of a few are so starkly counterposed against potential life-or-death consequences to the larger community.  "There is no question that limiting the spread of COVID-19 and protecting at-risk individuals from exposure to the virus are critically important public policies."  *U.S. v. Donziger*, 2020 WL 5152162, *2 (S.D.N.Y. 2020).  The University has justifiably determined that the Vaccine Requirement is a critical tool in preventing contagion on campus and minimizing sickness, hospitalizations, and maybe death.  Meanwhile, "the students 'are not asking to be allowed to make a self-contained choice to risk only their own health' in [seeking to avoid vaccination] – their decision necessarily bears on the health of other students, faculty, and staff" and the surrounding community. *Klaassen I*, 2021 WL 3073926, at *43 (quoting *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021).  The public interest here weighs decisively against an injunction that would elevate the interests of these two students over the University's efforts to protect the health and well-being of the tens of thousands of people who live, work, and study on campus.

### <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunction should be denied and the Complaint should be dismissed in its entirety.

---

[37]    Plaintiffs' claim of irreparable harm is further undermined by their having waited over three months from the announcement of the Vaccine Requirement in late April 2021 to seek an injunction. This "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."  *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.,* 645 F.3d 26, 35 (1st Cir. 2011).

Respectfully submitted,

MAURA HEALEY
ATTORNEY GENERAL

*/s/ Richard S. Weitzel*
Richard S. Weitzel (BBO No. 630303)
  Assistant Attorney General
Christine Fimognari (BBO No. 703410)
  Special Assistant Attorney General
Office of the Attorney General of Massachusetts
Government Bureau
One Ashburton Place
Boston, MA 02108-1698
(617) 963-2022
richard.weitzel@mass.gov
christine.fimognari.mass.gov

August 17, 2021

## CERTIFICATE OF SERVICE

I certify that, on August 17, 2021, this document was filed through the Electronic Case Filing (ECF) system and thus copies of will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

*/s/ Richard S. Weitzel*
Richard S. Weitzel
Assistant Attorney General