## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ———————————————————— ) | | |
| ) | | |
| HUNTER HARRIS and CORA CLUETT, ) | | |
| ) | | |
| **Plaintiffs** ) | | |
| ) | | |
| **v.** ) | | |
| ) | | **Case No. 21-cv-11244-DJC** |
| UNIVERSITY OF MASSACHUSETTS, ) | | |
| LOWELL, UNIVERSITY OF ) | | |
| MASSACHUSETTS, BOSTON, JACQUELINE ) | | |
| MOLONEY, MARCELO SUÁREZ-OROZCO ) | | |
| and SHAWN DE VEAU, ) | | |
| ) | | |
| **Defendants.** ) | | |
| ) | | |
| ———————————————————— ) | | |

## MEMORANDUM AND ORDER

**Casper, J.**                                                                                              **August 27, 2021**

## I.    Introduction

Plaintiffs Hunter Harris ("Harris") and Cora Cluett ("Cluett") have filed this lawsuit against

Defendants University of Massachusetts, Lowell ("UMass Lowell"), University of Massachusetts,

Boston ("UMass Boston") (collectively, "UMass"), Jacqueline Moloney ("Moloney"), Chancellor

of UMass Lowell, Marcelo Suárez-Orozco ("Suárez-Orozco"), Chancellor of UMass Boston, and

Shawn De Veau ("De Veau"), Interim Vice Chancellor for Student Affairs at UMass Boston

(collectively, "Defendants"), alleging violations of their Fourteenth Amendment Rights (Counts I,

II and IV) in connection with UMass requiring that students be fully vaccinated against COVID-

19 to return to campus, and as to Cluett, violations of Massachusetts law and her rights under the

United States and Massachusetts Constitutions (Count III) in connection with UMass Boston denying her request for a religious exemption.[1]  D. 1.  Plaintiffs have moved for a preliminary injunction to prevent Defendants from enforcing the vaccine requirements prior to the fall semester, which begins next month, and Cluett has asked this Court to "enforce her religious exemption" against UMass.  D. 2.  Defendants have opposed the motion and moved to dismiss the complaint.  D. 8, 9.  For the reasons discussed below, the Court DENIES Plaintiffs' motion for a preliminary injunction, D. 2, and ALLOWS Defendants' motion to dismiss, D. 8.

## II.   Standard of Review

### A.   <u>Injunctive Relief</u>

A preliminary injunction "is an 'extraordinary and drastic remedy.'"  <u>Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.</u>, 645 F.3d 26, 32 (1st Cir. 2011) (quoting <u>Munaf v. Geren</u>, 553 U.S. 674, 689-90 (2008)).  To obtain such relief, the Court must consider:  (1) the movant's likelihood of success on the merits on his/her claims; (2) the likelihood of the movant suffering irreparable harm in the absence of the injunctive relief sought; (3) the balance of hardships between the parties; and (4) whether granting the injunction is in the public interest.  <u>Corp. Techs., Inc. v. Harnett</u>, 731 F.3d 6, 9 (1st Cir. 2013).  Likelihood of success on the merits is the "main bearing wall of this framework."  <u>W Holding Co. v. AIG Ins. Co.-Puerto Rico</u>, 748 F.3d 377, 383 (1st Cir. 2014) (internal quotation marks omitted) (quoting <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 16 (1st Cir. 1996)).  Irreparable harm, on the other hand, is

---

[1] Plaintiffs assert three freestanding constitutional claims (Counts I-III) and a general cause of action under 42 U.S.C. § 1983 (Count IV).  D. 1 at 9–15.  § 1983 is "not itself a source of substantive rights," but rather "a means by which litigants complaining of a violation of a constitutional right may bring their claim before a court."  <u>Hickey v. Tompkins</u>, No. 19-cv-11349-LTS, 2021 WL 858439, at *3 n.3 (D. Mass. Mar. 8, 2021).  The Court will address the freestanding constitutional claims as if brought under § 1983, <u>see id.</u>, therefore Count IV is duplicative of the other counts.  D. 1 ¶¶ 81–82.

measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Braintree Labs., Inc. v. Citigroup Global Mkts., Inc., 622 F.3d 36, 42-43 (1st Cir. 2010) (internal citation and quotation marks omitted). Plaintiffs "bear[] the burden of establishing that these four factors weigh in [their] favor." Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).

### B.   Motion to Dismiss

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit. Id. Second, the Court must "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." Schatz, 669 F.3d at 55. If they do not, then dismissal is warranted. See Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011).

### III.   Factual Background

Unless otherwise noted, the following facts are drawn from Plaintiffs' complaint, D. 1, Plaintiffs' motion for a preliminary injunction, D. 2–3, Defendants' opposition to same, D. 9, and

documents and affidavits referenced therein.[2]   For the purposes of the motion to dismiss, D. 8, the Court confines itself to and accepts as true all well-pleaded facts in the complaint, save for considering "documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011).

### A.   Introduction

UMass Lowell and UMass Boston have imposed requirements, discussed further below, that students who seek to be on campus are vaccinated prior to the fall semester ("Vaccine Policy"), which begins on September 1 or September 8, 2021, respectively.  D. 1 ¶¶ 10, 14; D. 2 at 2.  The Plaintiffs in this case—Harris, a student at UMass Lowell, and Cluett, a student at UMass Boston—have not received the COVID-19 vaccine.  D. 1 ¶¶ 41–42.  Cluett sought a religious exemption from the Vaccine Policy but UMass Boston has denied that request.  Id. ¶¶ 43, 70–74. Harris has not sought any exemptions.  See id. ¶ 44.  Plaintiffs allege that by failing to get a COVID-19 vaccine, they "face expulsion" from UMass.  Id. ¶ 42.

### B.   COVID-19

COVID-19 is an infectious disease that can cause immediate severe illness, long-term ongoing health problems or  death.  D. 10 ¶¶ 10, 12-13 (Green Decl.).  There have been approximately 35 million cases of COVID-19  and over 600,000 people have died from COVID-19 in the United States alone.  Id.  ¶ 19 (citing the CDC estimates).  From February 2020 until

---

[2] In connection with their motion for injunctive relief, Plaintiffs have submitted and the Court has reviewed the declaration of Dr. Peter McCullough who practices internal medicine and clinic cardiology, in addition to teaching medicine and conducting research.  See D. 18 ("McCullough Decl.").   In connection with their opposition to same, Defendants have submitted and the Court has reviewed the declaration of Dr. Sharone Green who practices as an infectious disease physician, and is a professor at UMass Medical School, where she serves as its Infectious Disease Officer.  See D. 10 ("Green Decl.").  Defendants have also submitted the declarations of Christine Packard, Director of Enterprise Risk Management at UMass, D. 11 ("Packard Decl.") and of De Veau, D. 12 ("De Veau Decl.").

August 14 of this year, Massachusetts had over 686,018 confirmed COVID-19 cases and 17,773 confirmed deaths.  Id.  ¶ 16.  People of all ages can contract and transmit COVID-19.  Id. ¶¶ 11, 13; D. 18 ¶ 13 (McCullough Decl.) (citing CDC, *Risk for COVID-19 Infection, Hospitalization, and Death By Age Group* (Jul. 19, 2021), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last visited Aug. 26, 2021).  18–29-year-olds have had the highest rates of infection (per capita) since July 2020. D. 10 ¶ 65 (citing CDC data).  In general, COVID-19 affects children and young adults less severely than middle aged and older adults, see id., but has been shown to cause severe illness in younger people.  D. 10 ¶ 13; see American Academy of Pediatrics, *Children and COVID-19: State-Level Data Report* (Aug. 23, 2021), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-and-covid-19-state-level-data-report (last visited Aug. 26, 2021).  Since June 2021, cases and hospitalizations due to COVID-19 have increased in Massachusetts, which in some areas of the state has been linked to more transmissible variants of COVID-19.  D. 10 ¶¶ 46–50.

Since the onset of the pandemic in 2020, UMass has implemented several mitigation measures to curb COVID-19's spread, including administering testing[3] and offering vaccines on campus.  D. 1 ¶ 63.  Both campuses require all students, faculty, staff, vendors and visitors (i.e., everyone) to wear a face-covering while inside in common spaces, regardless of vaccination status.[4]

---

[3] For tests conducted by each campus, UMass Lowell reported a positivity rate of 0.4% over the course of 2020 and UMass Boston reported a positivity rate of 0.7% since August 2020.  See D. 1 ¶¶ 57–58.

[4] At UMass Lowell, all faculty, staff, students, vendors and visitors are required to wear a face covering in indoor common spaces, regardless of vaccination status.  UMass Lowell, *COVID-19 Face Covering FAQ*, https://www.uml.edu/alert/coronavirus/returning/mask-FAQ.aspx (last visited Aug. 26, 2021).  Unvaccinated individuals (e.g., students with approved exemptions) are

C.     **COVID-19 Vaccines**

There are currently three vaccines available in the United States, Pfizer-BioNtech, Moderna and Johnson & Johnson/Janssen.  D. 10 ¶ 25.  When Plaintiffs filed their complaint, all three were available under Emergency Use Authorization ("EUA") from the Food and Drug Administration.  Id. ¶¶ 25–26.  The FDA has now approved the Pfizer-BioNTech vaccine.  See D. 18-6.  All three vaccines under the EUA went through multi-phase clinical trials for safety and efficacy.  D. 10 ¶¶ 27–28.  Each demonstrated a high level of efficacy, both in published clinical trials and data from post-vaccination collecting on incidence of severe illness, hospitalization and death.  Id. ¶¶ 28–30.  Severe side-effects have also been uncommon, but have included allergic reactions, blood clots and heart inflammation in certain populations.  Id. ¶¶ 34–40.[5]  From

---

required to wear a face covering at all times in any indoor location, except for eating, drinking and when alone in a residence hall.  Id.  Fully vaccinated faculty members will be able to choose to remove face coverings while teaching in-person classes.  Id.  At UMass Boston, all students, faculty, staff, contractors and visitors must wear face coverings in common indoor spaces, regardless of vaccination status.  UMass Boston, *COVID-19 University Policy August 2021: Face Covering Policy*, https://www.umb.edu/coronavirus/covid_19_university_policy (last visited Aug. 26, 2021).  Face coverings may be removed when an individual is alone in a personal space (e.g., a residence hall room) or when actively eating or drinking.  Id.

[5] McCullough disputes the safety and efficacy of the vaccines.  See generally D. 18.  McCullough cites to data from the Vaccine Adverse Event Reporting System ("VAERS"), see id. ¶¶ 33–38, which accepts reports of adverse events and reactions that occur following vaccination from providers, patients and members of the public (i.e., anyone).  D. 10 ¶ 41.  Out of over 363 million doses of COVID-19 vaccines administered in the United States from December 14, 2020 to August 23, 2021, VAERS received 6,968 reports of death (0.0019%) among people who received a COVID-19 vaccine.  CDC, *Selected Adverse Events Reported after COVID-19 Vaccination* (Aug. 23, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html (last visited Aug. 26, 2021).  Healthcare providers are required to "report any death after COVID-19 vaccination to VAERS, even if it's unclear whether the vaccine was the cause," thus "[r]eports of adverse events to VAERS following vaccination, including deaths, do not necessarily mean that a vaccine caused a health problem."  Id.  The CDC has not found a causal link between these adverse events and COVID-19 vaccines after reviewing available information, including autopsy and medical records.  Id.  McCullough also cites the higher incidence of myocarditis (heart inflammation) among college-aged males that received an mRNA vaccine.  See D. 18 ¶ 41.  Such study concluded that the benefits of vaccination outweighed the risk of myocarditis:  per million vaccine doses administered among males aged 18–24, 45–56 cases of myocarditis were expected

December 14, 2020 to August 15, 2021, over 357 million doses of the COVID-19 vaccines were administered in the United States.  Id. ¶ 29.

      **D.**     **UMass Vaccine Requirements**

           1.    *UMass Lowell*

On April 28, 2021, UMass Lowell announced that it would require all students to be fully vaccinated against COVID-19 prior to the beginning of the fall semester "to live, learn or visit any UMass Lowell campus or property," unless students received a medical, disability or religious exemption "consistent with state and federal laws."  D. 1 ¶¶ 10–11; Joseph Hartman, *UMass Lowell to Require Student COVID-19 Vaccinations for Fall* (Apr. 28, 2021), www.uml.edu/alert/coronavirus/4-27-21-student-vaccine-requirement.aspx (last visited Aug. 26, 2021).  In its announcement, UMass Lowell stated that the reasoning behind its policy was "widely anticipated additional state and federal public health guidelines in the coming months as well as ample vaccine availability," and that it was UMass Lowell's "most effective tool to return to the vibrant, dynamic and interpersonal pre-pandemic campus life."  Hartman, *supra*.  UMass relied upon CDC guidance "that COVID-19 vaccines are safe and the most effective way to prevent the spread of COVID-19," given that "preventing the spread of COVID-19 was a critical public health goal for each campus, particularly in light of the congregate setting of each campus."  D. 11 ¶¶ 18–19 (Packard Decl.).  Although Plaintiffs allege that faculty and staff are not yet required to be vaccinated against COVID-19, D. 1 ¶ 12, UMass Lowell most recently reports that non-union, part-time employees and vendors must be vaccinated, D. 11 ¶ 34, and as to unionized faculty and

---

and such vaccinations were predicted to prevent 12,100 COVID-19 cases, 530 hospitalizations, 127 ICU admissions and 3 deaths.  Gargano, Julia et al., *Use of mRNA COVID-19 Vaccine After Reports of Myocarditis Among Vaccine Recipients: Update from the Advisory Committee on Immunization Practices,* (Jul. 9, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7027e2.htm (last visited Aug. 26, 2021).

staff, it "is in conversations with leaders of each of its unions with the goal of requiring vaccinations." Id.

By August 23, 2021, students were required to submit proof of vaccination to their Student Health Services Patient Portal or have an approved religious or medical exemption. See *COVID-19 Vaccine FAQ*, www.uml.edu/alert/coronavirus/returning/covid-vaccine-faq.aspx (last visited Aug. 26, 2021). Students not meeting these requirements would not be allowed to move into residence halls and would need to change their schedule to online courses. Id. For Fall 2021, UMass Lowell planned to offer "primarily in-person courses with some online options." D. 11 ¶ 27.

        2.     *UMass Boston*

On April 26, 2021, UMass Boston announced its policy that students "who are coming to campus, or physically accessing campus resources for the fall semester, and wish to live, learn and/or conduct research on campus" would need to be vaccinated, unless they received a medical, disability or religious exemption. D. 1 ¶¶ 14–15; Marie Bowen, et al., *An Update on Vaccinations for the UMass Boston Community* (Apr. 26, 2021), www.umb.edu/news/detail/an_update_on_vaccinations_for_the_umass_boston_community (last visited Aug. 26, 2021). UMass Boston stated that a "critical factor" to its plans for a "return to campus" was "widespread immunization" as more vaccine becomes available to immunize against the COVID-19 virus and as "vaccination is the most effective way to stop the spread of the virus." Id.; D. 11 ¶¶ 18–19. UMass Boston planned to offer "primarily in-person instruction with certain courses being offered in hybrid or remote modalities under a pilot program." D. 11 ¶ 27. Although Plaintiffs allege that faculty and staff at UMass Boston are not yet required to receive the COVID-19 vaccine, D. 1 ¶ 16, UMass Boston reports that it is now also is in discussions with faculty and

staff unions on agreements to require vaccination.  D. 11 ¶ 35.  As of the motion hearing on August 26, 2021, counsel for UMass represented that although negotiations with certain work units continue, most of its faculty and staff are now required to get the vaccine.

### E.    Cluett's Religious Exemptions

Students at UMass Boston requesting a religious exemption had to submit an initial request that is reviewed by a committee of medical, counseling and staff professionals.  See D. 12 ¶¶ 5–6 (De Veau Decl.).  The committee takes a "holistic approach" to reviewing initial exemption requests.  Id.  If a student appeals the committee decision, De Veau reviews those himself and also engages in a "holistic process:  review[ing] the student's request, research[ing] the faith tradition on which they are basing their request, and respond[ing] to the students based on [his] research." Id. ¶ 8.  "If students send further replies after receiving [his] response, [he] engage[s] in phone or email conversations with them."  Id.

On May 18, 2021, Cluett submitted a religious exemption form to UMass Boston.  D. 1 ¶ 70; D. 18-2.  On June 23, 2021, Cluett submitted a written statement in support of her request, D. 12-2, and received a reply later that day that the committee would review her request.  D. 1 ¶ 71. On July 15, 2021, UMass Boston notified Cluett that her initial request was not approved and directed her to send an appeal to De Veau.  Id. ¶ 72.  On July 21, 2021, Cluett sought clarification from UMass Boston on why her request was denied so that she could make an "informed appeal," to which De Veau emailed Cluett that in her appeal, she should provide "[p]roof of a sincerely held religious belief," as "1. A signed statement from a religious official describing the religious tenet that precludes the taking of a vaccine and/or 2. A personally written statement describing the religious basis for [her] objection to taking this vaccine versus the other vaccines which [she]

previously submitted evidence of having."[6]  D. 18-2 at 23–27; D. 12-6.  On July 23, 2021, Cluett sent a letter appealing the initial decision.  D. 1 ¶ 73.[7]  On July 26, 2021, De Veau wrote to Cluett that he denied her appeal, since he determined from the substance of her request that she was Roman Catholic and concluded from his research that the COVID-19 vaccine would not violate tenets of that faith.  Id. ¶ 74.   In interpreting Cluett's faith to be Roman Catholic, De Veau stated "[i]f this is incorrect, please let me know."  D. 12-8.  De Veau then cited a statement from the United States Conference of Catholic Bishops that receiving the COVID-19 vaccines was "morally justified."  Id.  De Veau concluded, based upon this information and other research, that he did not see "any specific religious tenets that would prevent someone of the Roman Catholic faith from receiving a vaccine, if they chose to do so.  On this basis and without further documentation indicating such a tenet," De Veau denied Cluett's appeal.  Id.  De Veau then informed Cluett that she could "unregister from face-to-face courses for the coming semester and see if circumstances change for the Spring 2022 semester."  Id.

## IV.    Procedural History

Plaintiffs initiated this lawsuit on July 30, 2021, approximately three months after UMass announced its Vaccine Policy, and moved for a preliminary injunction.  D. 1, 2.  Defendants opposed the motion and have now moved to dismiss Plaintiffs' complaint.  D. 8, 9.  The Court heard the parties on the pending motions and took these matters under advisement.  D. 19.

---

[6] Cluett has received prior vaccines, including flu and meningitis shots.  See D. 12-4.

[7] In her appeal letter, Cluett described her upbringing, including admiration for the faith of her grandmother, her attendance of CCD, baptism, Holy Communion and Confirmation.  See D. 12-7 at 2.  She asserted that "[a]ll COVID-19 injections violate [her] understanding of what God wants for [her] life," and that her "healthful approach to caring for [her] God-given temple is the best and only acceptable approach to caring for [her] immune system."  See id.

## V.      Discussion

### A.      Plaintiffs Cannot Sue UMass

The Eleventh Amendment bars federal suits by citizens against state agencies, or arms of the state like UMass Lowell and UMass Boston, "regardless of the nature of the relief sought." O'Neill v. Baker, 210 F.3d 41, 47 (1st Cir. 2000) (quoting Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100 (1984)); United States v. Univ. of Mass., Worcester, 812 F.3d 35, 40 (1st Cir. 2016) (finding that UMass is arm of the state).  Plaintiffs concede this point and assent to dismissal of all claims against UMass Lowell and UMass Boston. See D. 17 at 1.  Accordingly, the Court allows the motion to dismiss as to UMass.

### B.      Preliminary Injunction Factors

#### 1.      *Likelihood of Success on the Merits*

##### a)      Procedural Due Process (Count I)

To succeed on a procedural due process claim, Plaintiffs "must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [them] of that interest without constitutionally adequate process." Garcia-Gonzalez v. Puig-Morales, 761 F.3d 81, 88 (1st Cir. 2014) (internal citations omitted).  Here, Plaintiffs assert a liberty interest in continuing their education at UMass and state that they are forced to "take an unapproved vaccine or leave." D. 3 at 14; D. 1 ¶ 40.  As a preliminary matter even assuming *arguendo* that a UMass education is a protected liberty interest, the record before the Court indicates that the Vaccine Policy does not create such stark options.  Students who decline to be vaccinated are prohibited from in-person classes, dormitories and other activities this semester.  They, however, may remain enrolled and may still take classes online. See D. 11 ¶ 27.  In other words, students will not face expulsion for failing to comply with the Vaccine Policy. See D. 12 ¶ 18.  Although online classes may not provide the student experience that an on-campus presence would (i.e., dorm life,

participation in extracurricular activities, including athletics), this does not amount to the deprivation of a UMass education that Plaintiffs allege.  Even assuming such deprivation, their procedural                                     due                                      process claim still fails.  Because the Vaccine Policy is generally applicable to all students and formulated prospectively toward the fall semester (i.e., a legislative rule rather than an adjudication), they are "not entitled to [process] above and beyond the notice provided by the enactment and publication" of the Vaccine Policy itself.  See Garcia-Rubiera v. Fortuno, 665 F.3d 261, 272 (1st Cir. 2011) (citing United States v. Locke, 471 U.S. 84, 108 (1985) (explaining that "[i]n altering substantive rights through enactment of rules of general applicability, a legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it, and, to the extent the statute regulates private conduct, affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements")); Chrysafis v. Marks, No. 21-CV-2516, 2021 WL 2405802, at *8 (E.D.N.Y. June 11, 2021) (concluding that COVID-19 eviction moratorium was legislative rather than adjudicative because it was the "formulation of a general rule to be applied at a subsequent time") (internal citation omitted).  Accordingly, as to the generally applicable Vaccine Policy announced in April 2021 to take effect by September 2021, Plaintiffs have failed to state a plausible claim that they were denied procedural due process.

b)    Substantive Due Process (Count II)

Nor have Plaintiffs stated a plausible claim for violation of substantive due process. Plaintiffs also fail to identify a fundamental right protected by the Due Process Clause, and because of that, they fail to show that the Vaccine Policy is not rationally related to a legitimate government end.  See Washington v. Glucksberg, 521 U.S. 702, 728 (1997).  In addition to the Court's

deprivation analysis above, the Supreme Court has "settled that it is within the police power of a state to provide for compulsory vaccination," which the state may delegate to local officials and others "vest[ed] [with] broad discretion in matters affecting the application and enforcement of the law." Zucht v. King, 260 U.S. 174, 176 (1922) (citing Jacobson v. Mass., 197 U.S. 11, 26 (1905)); Klaassen v. Trustees of Indiana Univ., 7 F.4th 592, 2021 WL 3281209 at *1 (7th Cir. 2021) (rejecting assertion of fundamental right in substantive due process claim because "vaccination requirements, like other public-health measures, have been common in this nation"). Accordingly, the Court considers whether the Vaccine Policy lacks a "real or substantial relation" to public health and safety, whether the Vaccine Policy is "beyond all question, a plain palpable invasion of rights secured by fundamental law" and whether it is so arbitrary and oppressive as to warrant judicial interference. See Jacobson, 197 U.S. at 31–38. Contrary to Plaintiffs' attempt to distinguish Jacobson on its facts, the case commands a deferential standard for analyzing Fourteenth Amendment challenges to generally applicable public health measures like the one here. See Roman Cath. Diocese of Brooklyn v. Cuomo, __ U.S. __, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring) (explaining that Jacobson is "essentially . . . rational basis review").

Curbing the spread of COVID-19 is "unquestionably a compelling interest." Roman Cath. Diocese of Brooklyn, 141 S. Ct. at 67 (per curiam). Other legitimate goals flow from that, like returning students safely to campus, where students gather in common areas, like classrooms and residence halls. Defendants have determined several steps are necessary to achieve these goals such as offering testing, requiring face-coverings, and now, vaccination. The Vaccine Requirement further "protects not only the vaccinated persons but also those who come in contact with them." Klaassen, 2021 WL 3281209 at *1. Moreover, the Vaccine Requirement here poses even fewer constitutional concerns than in Jacobson, which upheld a fine if any adult did not get

a smallpox vaccine, as students may seek exemptions, opt to take online classes or defer their enrollment for the semester.  See id.

Contrary to Plaintiffs' assertion that the Vaccine Policy is arbitrary or not based in science, the Defendants based the decision upon both medical and scientific evidence and research and guidance, D. 10 ¶¶ 27–40; D. 11 ¶¶ 17–19, and thus is at least rationally related to these legitimate interests.  Defendants' affidavits attest that the Vaccine Policy was supported by, among other things, CDC guidance and research that the vaccines were safe and effective at reducing the incidence and severity of COVID-19 since "preventing the spread of COVID-19 was a critical public health goal for each campus, particularly in light of the congregate setting of each campus." See id.  Plaintiffs' argument that the rational basis for the Vaccine Policy is defeated because faculty and staff are not yet subject to such a policy is undermined by the evolving policy that now requires most faculty and staff to be vaccinated as well.  See D. 11 ¶¶ 29–35 (describing UMass plans to require vaccines for faculty and staff pending union negotiations).  Even if UMass did not seek to require vaccines for faculty and staff, it still has asserted a rational basis to require them for students, especially given the higher transmission rate among young people, D. 10 ¶ 65, and the fact that it is the students who are congregating in close quarters on campus.  D. 11 ¶ 17; see Baker v. City of Concord, 916 F.2d 744, 755 (1st Cir. 1990) (noting that "[e]ven the fact that legislation may be . . . underinclusive with regard to its goal does not signify that a rational relationship is lacking").  In any event, rational basis does not allow courts to second-guess the wisdom of these asserted reasons, so long as they are, as here, properly asserted.  See Phillips v. City of New York, 775 F.3d 538, 542 (2d Cir. 2015) (concluding that determination of effectiveness of vaccine requirement was "for the legislature, not the individual objectors"); Jacobson, 197 U.S. at 30 (explaining that courts should not determine which public health strategy

"was likely to be the most effective for the protection of the public against disease").  Accordingly, Plaintiffs have failed to state a substantive due process claim.

c)   <u>Denial of Religious Exemption (Count III)</u>

Cluett asserts that denying her requested religious exemption violates state law, and her state and federal constitutional rights.  D. 3 at 20.  As to whether Cluett has shown a likelihood of success on this claim for the purposes of injunctive relief, she has not.  De Veau, relying upon public statements from the Catholic Church regarding the COVID-19 vaccine and, in accord with Cluett's prior vaccination history, determined that De Veau's asserted religion did not prevent her from receiving the vaccine, should she personally choose to receive it.  <u>Id.</u> ¶ 17.  De Veau invited Cluett to supplement her submission, but she chose not to do so.  <u>Id.</u>; <u>see</u> <u>Caviezel v. Great Neck Pub. Sch.</u>, 701 F. Supp. 2d 414, 429 (E.D.N.Y. 2010), <u>aff'd</u>, 500 F. App'x 16 (2d Cir. 2012) (concluding that objection to vaccine was not religious in nature, in part because Church to which plaintiff belonged did not oppose vaccinations).  As to the motion to dismiss, even as alleged, Cluett's allegations regarding the denial of her religious exemption fail to state a claim.

First, several bases for this claim are foreclosed as a matter of law.  To the extent that Cluett bases her claim on UMass failing to comply with state statutory or constitutional law, <u>see</u> <u>id.</u>, the Eleventh Amendment stands in the way.  "While <u>Ex Parte Young</u>, 209 U.S. 123, 28 (1908), permits injunctive relief based on federal constitutional claims, it does not allow injunctive relief against state officials for violation of state law, which is the issue here."  <u>Diaz-Fonseca v. Puerto Rico</u>, 451 F.3d 13, 42–43 (1st Cir. 2006) (citing <u>Pennhurst</u>, 465 U.S. at 106); <u>O'Brien v. Mass. Bay Transp. Auth.</u>, 162 F.3d 40, 44 (1st Cir. 1998); <u>Wade v. Univ. of Connecticut Bd. of Trustees</u>, No. 3:21-CV-924 (JAM), 2021 WL 3616035, at *6 (D. Conn. Aug. 16, 2021) (dismissing claims against University President premised on violation of state law in challenge to COVID-19 vaccine

15

requirement).  Cluett further alleges that denying her exemption violates the Religious Freedom and Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1, but the RFRA cannot be applied to states or an arm of the state like UMass.  See City of Boerne v. Flores, 521 U.S. 507, 532–36 (1997).

Second, Cluett's reliance upon the First Amendment Free Exercise Clause also fails.  As a preliminary matter, UMass is under no constitutional obligation to offer a religious exemption to its Vaccine Requirement.  See Nikolao v. Lyon, 875 F.3d 310, 316 (6th Cir. 2017) (citing Jacobson, 197 U.S. 11 at 38); Phillips, 775 F.3d at 543 (concluding same) (citing Prince v. Mass., 321 U.S. 158, 166–67 (1944) (noting that "[t]he right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death"); Workman v. Mingo Cty. Bd. of Educ., 419 F. App'x 348, 355 (4th Cir. 2011) (concluding same); Whitlow v. California, 203 F. Supp. 3d 1079, 1086 (S.D. Cal. 2016) (concluding same).  Certainly, once the university offers religious exemptions," it must not administer them in an unconstitutional way.  See Nikolao, 875 F.3d at 316; Sherr v. Northport-E. Northport Union Free Sch. Dist., 672 F. Supp. 81, 91 (E.D.N.Y. 1987).  Here, however, Cluett has not alleged anything to suggest that Defendants have administered their religious exemption policy in a way that burdens some religions but not others, see Sherr, 672 F. Supp. at 91, or that Defendants have coerced her in her religious practices, see Nikolao, 875 F.3d at 316.  Accordingly, Count III also fails to state a claim.[8]

Since Plaintiffs have failed to state claims that survive Defendants' Rule 12(b)(6) challenge, they have also failed the first element of their showing for injunctive relief.

### 2.  *Irreparable Harm, Balance of Harms and the Public Interest*

Where, as here, "the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence," Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92

---

[8]Since the Court has concluded that Counts I-III have failed to state claims, Count IV, the duplicative count, also fails.

(1st Cir. 2020), the Court addresses them here in the interest of completeness.  Here, irreparable harm, balance of harms and the public interest, also do not weigh in favor of granting Plaintiffs' requested relief.  Even with the Vaccine Policy, students who choose not to comply with may still take online classes at UMass, or defer their enrollment for a semester, not amounting to irreparable harm. Moreover, the balance of equities tips in Defendants' favor given the strong public interest here that they are promoting—preventing further spread of COVID-19 on campus, a virus which has infected and taken the lives of thousands of Massachusetts residents.  Bayley's Campground Inc. v. Mills, 463 F. Supp. 3d 22, 38 (D. Me. 2020), aff'd, 985 F.3d 153 (1st Cir. 2021) (concluding that public interest in state COVID-19 response is "enormous").  Plaintiffs' requested relief here would weaken the efforts of UMass to carry out those goals.  Similarly, given the public health efforts promoted by the Vaccine Policy, enjoining the continuation of same is not in the public interest.  See Bimber's Delwood, Inc. v. James, 496 F. Supp. 3d 760, 789 (W.D.N.Y. 2020).

## VI.  Conclusion

For all these reasons, the Court DENIES Plaintiff's motion for a preliminary injunction, D. 2 and ALLOWS the motion to dismiss, D. 8.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge